KURT BIERIG & others[1] *vs.* EVERETT SQUARE PLAZA
ASSOCIATES & another.[2]

No. 90-P-1183.

Middlesex. January 7, 1992. - April 23, 1993.

Present: SMITH, JACOBS, & GILLERMAN, JJ.

*Housing. Massachusetts Housing Finance Agency. Administrative Law,*
Regulations. *Constitutional Law,* Public purpose. *Consumer Protection
Act,* Availability of remedy. *Landlord and Tenant,* Rent.

Discussion of the Massachusetts Housing Finance Agency Enabling Act,
St. 1966, c. 708; the programs under it, including the § 13A subsidy
program added by St. 1970, c. 855, § 10, as amended by St. 1975,
c. 643, § 3, and St. 1985, c. 259, § 3; and the implementing regulations
for the § 13A program, 770 Code Mass. Regs. § 2.00 (1978). [356-360,
363-364]

Rents payable in the years 1981 to 1985 by certain higher-income tenants
("market tenants") in a residential development financed by the Massa-
chusetts Housing Finance Agency (MHFA) were lawfully established
by the owner of the development with the approval of MHFA under
provisions of St. 1966, c. 708 (the Act), as effective during the relevant
period; in light of the statutory scheme, neither MHFA's regulations
nor an interest subsidy contract pursuant to § 13A of the Act had the
effect of limiting those tenants' rent to a below-market level. [365-367]

The owners of a residential development financed by the Massachusetts
Housing Finance Agency (MHFA) were entitled to summary judgment
on claims brought by certain tenants under G. L. c. 93A for alleged
excessive rent charges, where the rents charged those tenants were per-
mitted by the regulatory scheme administered by the MHFA and the
owners were thus exempt from c. 93A under the provisions of c. 93A,
§ 3. [367-368]

CIVIL ACTION commenced in the Superior Court Depart-
ment on January 24, 1985.

[1]Twenty-one individuals, all as members of the Sacro Plaza Below
Market Tenants' Group, an unincorporated association.
[2]Salvatore Sacro, as he is the managing general partner.

The case was heard by *Hiller B. Zobel*, J., on motions for summary judgment.

*John T. Montgomery* for the defendants.

*Paul R. Collier, III* (*Deborah L. McCutcheon* with him) for the plaintiffs.

SMITH, J. Certain "market tenants"[3] occupying fifteen units in a housing development, the construction of which was financed by the Massachusetts Housing Finance Agency (MHFA) and which was owned by Everett Square Plaza Associates (owner), brought an action in the Superior Court against the owner, the managing general partner (partner), and MHFA. In their complaint, filed in January, 1985, the market tenants contended that they were charged excessive rent by the owner and, as a result, asserted several claims for breach of contract and violations of various statutes, including G. L. c. 93A. They also claimed that MHFA failed or refused to take any action against the owner to have it repay the excess rent.

On May 13, 1987, after determining that the amount in controversy was less than $25,000, a Superior Court judge transferred the matter to the District Court. There, the market tenants and the owner and partner filed cross motions for summary judgment. On January 24, 1989, a judge of the District Court entered summary judgment in favor of the market tenants against the owner and the partner but granted summary judgment in favor of MHFA. On April 24, 1989, the case was transferred to the Superior Court.

On April 12, 1990, a Superior Court judge, acting on the cross motions for summary judgment filed in the District Court, ruled in favor of the market tenants against the owner and the partner. The judge's ruling included a finding of a violation of G. L. c. 93A, § 2. Judgment entered against the owner and the partner, jointly and severally, for double damages ($38,325), interest and attorneys' fees ($47,000), and costs ($2,379.40). The judge granted MHFA's motion for summary judgment. The owner and the partner have ap-

---

[3]See note 6, *infra*, for a definition of "market tenants" as used by the parties in this matter.

pealed from the grant of the market tenants' motion for summary judgment and the denial of their own summary judgment motions.

Before considering those matters, we deem it necessary to recount briefly the history of the Act, related statutes, programs, regulations, and other matters that are relevant to our analysis.

1. *The Act and Programs and Regulations Pursuant to the Act.*

a. *The Act.* In 1966, the Legislature addressed the shortage of affordable housing for low and moderate income persons by enacting the Massachusetts Housing Financing Agency Enabling Act, St. 1966, c. 708 (the Act).[4] Among other things, the Act established MHFA and authorized it to make mortgage loans to developers (owners) for the construction or rehabilitation of housing; such housing was to be available for low and moderate income persons and families at reduced rental rates.[5] The Act contemplated that MHFA would borrow money at a favorable interest rate and then lend it to owners at "interest [rates] lower than those which would be charged if the [owners] were to obtain funds in the general mortgage market." *Massachusetts Hous. Fin. Agency* v. *New England Merchs. Natl. Bank*, 356 Mass. 202,

---

[4] The Act can also be found at Mass. Gen. Laws Ann. c. 23A, Appendix (West 1981 & Supp. 1993).

[5] Section 1 of the Act, as amended through St. 1975, c. 643, § 1, provided the following definitions:

"(*d*) 'Low income persons or families' shall mean those persons and families whose annual income is equal to or less than the maximum amount which would make them eligible for units owned or leased by the housing authority in the city or town in which the project is located or, in the event that there is no housing authority, that amount which is established as the maximum for eligibility for low-rent units by the department of community affairs.

.  .  .

"(*h*) 'Moderate income persons or families' shall mean those persons or families other than low income persons or families whose annual income is less than the amount necessary to enable them to obtain and maintain decent, safe and sanitary housing without the expenditure of over twenty-five percent of such income for basic shelter costs, including the additional costs, if any, of heat and hot water."

209 (1969). The savings in interest to the owners were to be passed on to the low or moderate income tenants in the form of lower rent. *Ibid.*

The Legislature mandated that MHFA-financed projects contain a mix of families of varied economic means, not only for the increased revenue brought to the projects by moderate and higher income persons, but also as a means of preventing the recurrence of slum conditions. "An income mix was central to the stated goal of 'prevent[ing] the recurrence of slum conditions and assist[ing] in their permanent elimination by housing persons of varied economic means in the same projects and neighborhoods.' " *Tedford* v. *Massachusetts Hous. Fin. Agency*, 390 Mass. 688, 696-697 (1984), quoting from § 2 of the Act, as inserted by St. 1966, c. 708, § 2. See also *Zoning Bd. of Appeals of Wellesley* v. *Housing Appeals Comm.*, 385 Mass. 651, 655 (1982). In furtherance of that goal, the Act in § 6(*b*) required that at least "twenty-five per cent of the units . . . be rented at all times to low income persons or families at [an] adjusted rental . . . ." As to the remaining units, "[t]he Legislature contemplated that . . . [they] would be rented to moderate and high income tenants . . . ."[6] *Tedford* v. *Massachusetts Hous. Fin. Agency*, 390 Mass. at 696. Those tenants would rent units "at rentals not lower than the below-market rental for the unit and sufficiently high as determined by MHFA to achieve and maintain a fiscally sound project."[7] *Ibid.*, quot-

---

[6]Higher income tenants are called "market tenants" by the parties. They are described as tenants whose income exceeds the moderate income tenant formula mandated by the Act. The parties have stipulated that all the plaintiffs in this action are market tenants.

It is clear that the Act permitted the rental of some units in MHFA-financed projects to persons whose income exceeded the moderate income standards. See *Board of Appeals of Wellesley* v. *Housing Appeals Comm.*, 385 Mass. at 655 ("Thus, MHFA is a program whose purpose is to aid the construction of low or moderate income housing, although such projects may include units rented at fair market rates").

[7]Section 6(*a*) of the Act requires that rent determinations be established for each housing unit located in a development at all MHFA financed projects in relation to three benchmark levels:

(1) the "market rate rental" that would be appropriate if the project had been financed commercially;

ing from § 6(b) of the Act. To induce higher income persons and families to become tenants, the Act, in § 7(b), as amended by St. 1970, c. 855, § 8, provided that "[t]enants whose incomes . . . exceed seven times the rental then being charged for the unit occupied shall have the rental for that unit increased to a figure, not in excess of the market rate rental, which will equal one seventh of the tenant's then net annual income."[8]

After its enactment, questions concerning the constitutionality of the Act were raised through a declaratory judgment action. The questions were directed at those provisions in the Act that allowed moderate and higher income tenants to receive rent reductions below the market rate. The Supreme Judicial Court was asked to rule whether those provisions violated Part II, c. 1, § 1, art. 4, of the Massachusetts Constitution, which forbids money raised by taxation to be used for the benefit of private individuals. *Opinion of the Justices*, 368 Mass. 880, 885 (1975) ("It is a fundamental principle of constitutional law frequently declared that money raised by taxation can be used only for public purposes and not for the advantage of private individuals").

In *Massachusetts Hous. Fin. Agency* v. *New England Merchs. Natl. Bank*, 356 Mass. at 212, the court ruled that

---

(2) the "below-market rate rental" which adjusts the market rate for the difference between commercial interest rates and applicable MHFA interest rate;

(3) the "adjusted rental" which is the below-market rate rental further reduced to establish an affordable rent for low income persons.

MHFA may review and adjust these rental determinations from time to time.

The MHFA required owners to place in an account labeled the "excess rental account" all rentals received with respect to any unit in the project in excess of the below-market rental rate established for that unit. If the funds in that account exceeded a certain amount, they were to be used solely for the reduction of rents of those tenants qualified as low income tenants. See also § 6(c) of the Act.

[8]In this matter, the market tenants have limited the damages they claim to the amount equal to the difference between the below-market rate rentals and the rent actually charged. Consequently, any impact of the one-seventh provision in § 7(b) of the Act has not been considered. See also note 12, *infra*.

the Act was constitutional. The court concluded that any benefit in the form of rent reductions to moderate or higher income persons in the Act was "only incidental to the primary objective" of providing low income housing. *Ibid.* In order to preserve the constitutionality of the Act, the court found, however, that the Act must be read to imply that "rents for tenants other than low income persons or families should not be fixed below the market rent level for comparable property by more than the minimum amount found by MHFA to be necessary to induce suitable persons of moderate income to occupy apartments in a project where the mixture of tenants may be extremely diverse." *Id.* at 213.

b. *The 13A subsidy program.* In 1970, in order to make MHFA-financed projects more desirable to owners, the Legislature added § 13A to the Act. St. 1970, c. 855, § 10. That section authorized MHFA to operate a mortgage interest subsidy program on behalf of low income persons and families living in MHFA-financed projects (the 13A program). In 1975, the Legislature amended § 13A to add moderate income persons and families to the program. St. 1975, c. 643, § 3. The 13A program did not include those persons or families whose income was above the moderate income level (i.e., market tenants).

The 13A program was designed to operate in the following manner. MHFA would designate certain units in a MHFA-financed project to receive a 13A program subsidy.[9] The Department of Community Affairs (DCA), now the Executive Office of Communities and Development, would pay to MHFA on behalf of the owner a 13A program subsidy for each unit so designated by MHFA. The payment would have the effect of reducing the owner's mortgage interest costs for the subsidized units to 1% per year, thereby making it possible to reduce the rent that low and moderate income tenants might be charged.

---

[9]MHFA designated sixty projects to receive 13A subsidy payments for some or all units contained in the projects. Forty projects, including the owner's projects, had all their units designated by MHFA to receive 13A program subsidy allocations.

c. *The 13A subsidy regulations.* Because public monies were being expended under the 13A program, MHFA promulgated, adopted, and published regulations in regard to that program. 770 Code Mass. Regs. § 2.00 (1978) (13A regulations). Those regulations reiterated that the 13A program was for the benefit of low and moderate income persons and families occupying units in MHFA-financed projects.

Among other things, the 13A regulations required owners to establish for low and moderate income persons and families a "basic monthly rental charge" — the lowest 13A program unit rent — and a "below market rate monthly rental" — the highest rent that could be charged for a unit receiving a 13A program subsidy. The regulations also stated that "[t]he monthly rental for such units . . . shall not be less than the basic monthly rental charge nor more than the below market rate monthly rental charge." 770 Code Mass. Regs. § 2.05 (1978).

d. *The 13A subsidy contract.* To implement the regulations, MHFA drafted an interest subsidy contract (13A contract) which tracked the regulations by (1) requiring the owner to establish a "basic monthly rental charge" and a "below market rental charge" for each unit receiving a 13A program subsidy and (2) providing that "in no event shall the rent charged exceed the below market rental established for each dwelling unit."

e. *The regulatory agreement.* MHFA also required any developer borrowing from it to sign a regulatory agreement which applied to all MHFA projects whether or not they received a 13A subsidy. That agreement, among other things, prohibited the owner from charging, collecting, or increasing rents without the written approval of MHFA, and incorporated the rental determination provisions of the Act.

2. *The Owner's Project and Disputed Rent Increases.*

a. *The project.* The parties stipulated to certain facts concerning the owner's project and the disputed rent increases. We summarize those facts.

On or about November 3, 1975, the owner obtained a $4,644,000 loan from MHFA for the construction of a hous-

ing project in Everett, to be known as Sacro Plaza or Everett Square Plaza. The project was to contain 131 units, and the owner agreed to rent 25% of the units at all times to low income persons or families.

On the same date, the owner, MHFA, and DCA executed a 13A contract. The 13A contract provided that *all* 131 units in the owner's project were to receive a 13A program subsidy. The 13A contract provided, among other things, that (1) the owner must establish a "below-market rental" charge and a "basic rental" charge equal to the below-market rate reduced by the 13A program subsidy and (2) rents for each unit would be "25% of the tenant's income . . . or the basic rental, whichever [was] greater *but in no event [could] the rent charged exceed the below market rental*" (emphasis supplied). The emphasized language forms the basis of the market tenants' action against the owner.

The below-market rentals were established at $390 per month for a one-bedroom unit and $460 per month for a two-bedroom unit. The theoretical market-rate rentals, required by § 6(*a*) of the Act, were set at $450 per month for a one-bedroom unit and $496 for a two-bedroom unit. Therefore, the rent reduction for so-called market tenants who paid the below-market rate rental was $36 or $60 per month depending on the size of the unit.

Other documents, including the regulatory agreement, provided that, "[t]o achieve an economically integrated development, a number of Federal or State programs may be used as well as skewed or market rentals." Further, the owner was required to use "best efforts" to rent 25% of the units to market tenants at "unsubsidized rents."

In sum, the agreements between MHFA and the owner provided that the entire 131-unit project would receive 13A program subsidies, yet the agreements specifically stated that the owner would rent a certain number of units at "unsubsidized" or "skewed or market rentals."

b. *The 1981 rent increase.* In 1977, the owner began renting units to eligible tenants at rents approved by MHFA. The units were rented to low and moderate income persons

and families and also to market tenants. At first, the number of units rented to market tenants was low, but, by 1981, 17% of the units were rented to market tenants.

On February 25, 1981, with rentals to market tenants approaching 20% of the project, the owner submitted a rent increase application to MHFA. The application requested MHFA approval for an increase of $50 per unit per month including a rent level for units occupied by market tenants which was *above* the below-market rate.

On May 5, 1981, MHFA approved a rent increase for market units to $440 per month and $510 per month for one and two-bedroom units, respectively, even though the below-market rents were set at $413 and $458. The market tenants' rents were above the established below-market rate but still below the theoretical market-rate rental established by MHFA. (The theoretical market-rate rentals had also been adjusted upward.) When establishing the market-rate levels, MHFA made no effort to determine whether the reduction from true market levels was "no greater than necessary" to achieve the mix of tenants of varied economic income levels which was the objective of the Act. See *Massachusetts Hous. Fin. Agency* v. *New England Merchs. Natl. Bank*, 356 Mass. at 212.

c. *Subsequent changes in MHFA's policy toward market tenants' rent.* On July 7, 1981, MHFA formally adopted and published a "Policy and Operating Procedures Handbook" (handbook). The handbook, among other things, specified "the materials which an owner must prepare when requesting a rent increase, and the procedure to be followed in reviewing a request." *Tedford* v. *Massachusetts Hous. Fin. Agency*, 390 Mass. at 691. On December 10, 1981, the MHFA board voted to amend the handbook to provide that "the market rate rental shall be the highest rate that may be obtainable on the market."

The amendment reflected a vote taken by the MHFA board on December 3, 1981, to "allow an owner to charge the maximum rent obtainable for market units without [MHFA] imposing a ceiling." On December 28, 1981, the

owner was notified of MHFA's new policy of allowing an owner to charge market tenants the market rate.

In March, 1982, the owner submitted to MHFA an application for a second rent increase. Because MHFA had informed the owner of the December 3, 1981, vote removing restrictions on market rents, the owner's proposed rent schedule submitted to MHFA sought approval only for rent increases for low and moderate income tenants. The increases were approved. In addition to raising the rents for low and moderate income tenants (to a level still below the below-market rate) the owner once again increased the market tenants' rent; their rent with the increase remained *above* the below-market rate but was still below the market rate. The excess rents were deposited by the owner in the excess income account (see note 7, *supra*).

On June 1, 1982, MHFA reconsidered its December, 1981, vote and authorized itself to "establish maximum rents for low, moderate, and market level units . . . ." On or about July 7, 1982, a MHFA management officer wrote to the owner stating, among other things, that a tenant's rent "should not exceed the below market rate."

On September 26, 1983, a MHFA management officer wrote to the owner stating that, "[a]s discussed with you previously, a number of rents at your development are overcharged. As this situation has existed for a number of years, it is incumbent that the tenants be rebated the overcharge portion of those rents."[10]

In March, 1985, the MHFA board amended the 13A regulations. (13A amended regulations). The 13A amended regulations authorized owners to charge market tenants "not . . .

---

[10]According to § 3 of the Act, as amended through St. 1981, c. 789, § 8, the MHFA board consists of the Secretary of Communities and Development and the Secretary of Administration and Finance and seven persons to be appointed by the Governor. It is undisputed that the board was never presented with a proposed vote to require the excessive portion of the market tenants' rent to be rebated and never has voted to require such a rebate. Further, there is nothing in the record that demonstrates that the board delegated to its staff any authority to reduce administratively the rents previously approved by the board.

less than the below market rate rental and not greater than the market rate rental . . . ." According to § 13A.1 of the amended regulations, the purpose of the amended regulations was "to conform the administration of the Section 13A [p]rogram to the Act and MHFA policy. In particular, these regulations are designed to eliminate possible inconsistencies between the prior regulations and the Act in regard to rental levels . . . ."

In 1985, the Legislature amended various sections of the Act. St. 1985, c. 259, § 3. Currently, § 6(*b*) of the Act provides that, "in each project which is not located in a housing development area, such units not made available to low or moderate income persons or families shall be made available *at rentals at least equal to the rental charged for similar units in the market area,* as determined by MHFA so that any benefit to the tenants who are not low and moderate income persons or families derived from the assistance provided to sponsors of projects will be at most incidental to and no greater than is necessary for achieving proper housing for low and moderate income persons and families" (emphasis supplied).

3. *Analysis of Issues Raised on Appeal.*

a. *The parties' respective claims.* In their motion for summary judgment, the market tenants claimed that the 1981 and 1982 rent increases were, as matter of law, in violation of the 13A regulations and 13A contract. According to the market tenants, neither the 13A regulation nor the 13A contract permitted the rents to exceed the below-market rate approved by MHFA.[11]

The owner's motion for summary judgment claimed the rent increases were approved by MHFA and were consistent with the policies of the Act; the 13A subsidy regulations and

---

[11]The market tenants alleged in their complaint that the owner, by charging rents in excess of the below-market rental charges approved by MHFA, violated the 13A contract. The market tenants acknowledge that they were not parties to the contract but claim that they were third-party beneficiaries of the contract. See *Rae* v. *Air-Speed, Inc.*, 386 Mass. 187, 194 (1982). Their claim that they were third-party beneficiaries has not been challenged by the owner.

13A contract were internally consistent but inconsistent with the Act; the rent levels for market tenants, if restricted to below-market levels, were too low and violated the public purpose clause of the Massachusetts Constitution. Finally, it claimed that the rent increases, as "permitted acts," were exempt from G. L. c. 93A, § 3.

b. *The judge's decision.* The judge ruled that the 13A regulations and the 13A contract barred the owner from charging the market tenants more than the below-market rental rate from 1981 to 1985. (There is no dispute that, with the amended regulations and the amendment by the Legislature of the Act, after 1985 the owner was entitled to market-rate rentals from the market tenants.) On the c. 93A count, the judge found that, after the owner received the market tenants' c. 93A demand letter, the owner declined to make any offer of settlement. The judge then ruled that, "[a]bsent any explanation for this intransigence, I am forced to conclude not only that [the owner] did not tender reasonable relief nor act in good faith (indeed, that the refusal to grant relief was made in bad faith with reason to know that the conduct which was the subject of the letter . . . was unfair and deceptive), but also that the original overcharging and withholding of rebate were willful." The judge concluded that the market tenants were entitled to double damages plus attorneys' fees and costs.

c. *Analysis.* The judge committed error when he denied the owner's motion for summary judgment and granted the market tenants' motion. He also erred in finding a violation of G. L. c. 93A.

The market tenants' claim against the owner is entirely based on their contention that the 13A regulations and 13A contract expressly limited their rent level to the below-market level. Although, by their terms, both § 13A of the Act and the 13A regulations apply only to those units occupied by low and moderate income persons and families and not to those units occupied by market tenants, the 13A contract makes them applicable to market tenants. A contract cannot be more expansive than the statute under which it is exe-

cuted; otherwise it becomes unenforceable. *Coughlin* v. *Royal Indem. Co.*, 244 Mass. 317, 319 (1923). A regulation is not valid if it conflicts with the authorizing statute. *Commonwealth* v. *Miller*, 361 Mass. 644, 654 (1972). Therefore, the 13A regulations and 13A contract cannot be read to include market tenants merely because they occupy units receiving the 13A program subsidies.[12]

To hold otherwise would be to distort the statutory scheme underlying the Act. The Legislature mandated a mixture of tenants of varied economic means. It gave to MHFA the discretion to set rent levels for those market tenants (and others with incomes above the low income level). *Tedford* v. *Massachusetts Hous. Fin. Agency*, 390 Mass. at 696. The Legislature directed MHFA, however, to set those rentals "no[] lower than the below-market rental for the unit and sufficiently high as determined by MHFA to achieve and maintain a fiscally sound project." *Ibid.*, quoting from § 6(*b*) of the Act (prior to its amendment by St. 1985, c. 259, § 3). Thus, in the Act, the Legislature set a *floor* for market tenants' rent levels and left the amount of rent increases to the discretion of MHFA.

In contrast, the language in the 13A regulations and the 13A contract (rent levels "not to exceed the below-market rent established for such unit") upon which the market tenants rely, sets a *ceiling* for the rent levels of all subsidized units, regardless of the tenants' classification, thereby removing MHFA's discretion to raise market tenants' rents above the below-market levels.

The loss of discretion, if permitted, would conflict with the Act. Further, placing a ceiling on rent levels for market tenants may violate the public purpose clause of the Massachusetts Constitution. See *Massachusetts Hous. Fin. Agency* v. *New England Merchs. Natl. Bank*, 356 Mass. at 213-214 ("any benefit to tenants not within the low income category

---

[12]See *Tedford* v. *Massachusetts Hous. Fin. Agency*, 390 Mass. at 696-697, where the court held that under the Act MHFA had the discretion to require that a low income person who occupies a moderate income unit pay moderate rent levels.

will be at most incidental to, and no greater than is necessary for, achieving the Act's primary objective of proper housing in appropriate surroundings of persons of low income").

It is doubtful that the owner obtained a windfall by receiving 13A program subsidies for those units occupied by market tenants because the owner's earnings were limited by the Act and the money obtained from the higher rent would have had the effect of stabilizing the below-market rents. In any event, if the owner had a windfall from the market rents, that does not justify the market tenants' receiving a windfall in the form of reduced rents, beyond those permitted, where the Legislature has mandated otherwise.

4. *The G. L. c. 93A Claim.*

At trial, the judge granted summary judgment on the c. 93A claim in favor of the market tenants and awarded double damages as well as attorneys' fees. The owner argues that this was error; that it is exempt from c. 93A because the conduct complained of constituted permitted acts.[13] We agree.

General Laws c. 93A, § 3, as amended through St. 1983, c. 242, provides in pertinent part as follows: "Nothing in this chapter shall apply to transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth or of the United States." The burden of proof of exemption is on the owner.[14]

Here the rent levels themselves constituted the unfair condition complained of. The statutory scheme of the Act expressly permitted rents for market tenants to be above the

---

[13]Although the owner did not expressly set forth the "permitted act" exemption in its motion for summary judgment, it did raise the issue as an affirmative defense in its complaint and further, argued it throughout; it is, therefore, not precluded from raising this issue on appeal. See *Aerostatic Engr. Corp.* v. *Szczawinski,* 1 Mass. App. Ct. 141, 143 (1973).

[14]"The burden is a difficult one to meet. To sustain it, a defendant must show more than the mere existence of a related or even overlapping regulatory scheme that covers the transaction. Rather, a defendant must show that such scheme affirmatively *permits* the practice which is alleged to be unfair or deceptive." Greaney, Chapter 93A Rights and Remedies § 6-4 (1992) (emphasis original).

below-market rates and implicitly required it. This was not a situation where there was a "mere existence of a related or even overlapping regulatory scheme that covers the transaction." Greaney, Chapter 93A Rights and Remedies § 6-4 (1992). Rather, the Act, the regulations, and the evidence at the motion hearing clearly established that the rents charged were permitted by the regulatory scheme[15]; the owner is therefore exempt from judgment under c. 93A. See *DePasquale* v. *Ogden Suffolk Downs, Inc.*, 29 Mass. App. Ct. 658, 663 (1990) (as to that portion of the claim which was based on conduct governed by the regulatory scheme, there is no cause of action under G. L. c. 93A). Contrast *Commonwealth* v. *DeCotis*, 366 Mass. 234, 239-240 (1974) ("[w]ithout intimating that the . . . board of health had authority to regulate the financial aspects of a mobile park lease agreement, we conclude that the defendants have failed to meet their statutory burden [G. L. c. 93A, § 3(2)] of proving the availability of the exemption").

Accordingly, as to both claims, we reverse the summary judgment in favor of the market tenants. Judgment is to be entered for the owner and the general partner.

*So ordered.*

---

[15]Although, at one point, the MHFA staff suggested to the owner that it might be charging in excess of the rents permitted, this does not negate the exemption because (1) the MHFA board never officially voted to roll back the rents or to require the owner to rebate any excess rents, and (2) the letter to the owner from senior management in response to the owner's inquiry regarding rent restrictions stated in the July 7, 1983, letter from MHFA states that "market residents who qualify for 13A subsidy should have their rents adjusted down to the basic moderate rent level." According to § 13A of the Act, no market tenant would qualify for a 13A subsidy.