**Jane RINI, Plaintiff,**

v.

**UNITED VAN LINES, INC., Defendant.**

**Civ. A. No. 92–30260–MAP.**

United States District Court,
D. Massachusetts.

Nov. 1, 1995.

_____

**10.** See the previous footnote.

John P. Pucci, Fierst & Neiman, North-ampton, MA, Anne V. Romano, Law Offices of Anthony J. Siciliano, Springfield, MA, for Plaintiff.

Wesley S. Chused, Looney & Grossman, Boston, MA, for Defendant.

## MEMORANDUM REGARDING PLAINTIFF'S 93A CLAIM

PONSOR, District Judge.

### I. *INTRODUCTION*

Plaintiff Jane Rini ("Rini") brought this action against defendant United Van Lines, Inc. ("United") alleging, first, that United employees lost or stole valuable art work belonging to her during transport from South Carolina to Massachusetts, and, second, that United compounded the offense by subjecting her to a negligent and fraudulent claims process when she attempted to get compensation for the lost articles. Specifically, in her complaint Rini has averred that United was negligent, violated the Interstate Commerce Act, made misrepresentations, used unfair and deceptive acts in violation of Mass.Gen.L. ch. 93A, and caused her emotional distress. After an eight day trial, the jury returned a verdict for the plaintiff, awarding $50,000.00 in compensatory damages on the claim under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 11707, for the loss of the goods, and $100,000.00 in damages for United's neg-ligence and misrepresentation during the subsequent claims process.

Before the court is plaintiff's non-jury claim for multiple damages and attorneys' fees under Mass.Gen.L. ch. 93A and for attorneys' fees under the Carmack Amendment. Based on the testimony at trial and the extensive written submissions that followed, the court will enter judgment against United for engaging in unfair and deceptive trade practices prohibited under 93A. As will be seen, the extreme egregiousness of United's conduct during the claims process warrants the rare sanction of an award of treble damages. In accordance with the provisions of 93A and the Carmack Amendment, the court also will award reasonable attorneys' fees, costs and interest.[1]

## II. *FINDINGS OF FACT*

### A. *Pre–Transportation of Goods*

In the summer of 1990, Jane Rini was living with her three children in Myrtle Beach, South Carolina. During that summer, she decided to move with her children from Myrtle Beach to Northampton, Massachusetts, where she planned to attend Smith College under the Ada Comstock program for mature students.

On August 10, 1994, Rini contacted Nilson Van Lines, Inc. ("Nilson"), United's South Carolina agent, and requested an estimate for the cost of her move to Northampton. On August 14, 1990, Nilson's sales agent, Hilda Holston ("Holston"), came to Rini's house to give an estimate of her move. Rini gave Holston a tour of her home and identified the art work and other belongings that needed to be moved. Rini advised Holston of the substantial market value of the pieces of art and their significance as family heirlooms. Based on Holston's estimate and representations, Rini ultimately chose United to move her household belongings. Resolving a disputed issue at trial, the court specifically finds that Holston failed to give plaintiff a copy of the ICC's OCP–100 booklet entitled "Your Rights and Responsibilities When You

---

1. The issue of attorneys' fees, costs and interest will be addressed in a separate Memorandum and Order.

Move," a document the ICC requires to be given all shipping customers. This omission will have significance in the discussion below.

Nilson packers William Tonsor ("Tonsor") and Earl Herrington ("Herrington") arrived at Rini's house to pack her household items on August 20, 1990. Herrington personally wrapped the pieces of art work in packing paper and placed them into boxes. On the outside of each box, Herrington wrote a general description of the nature and condition of the art work. Among the art work Herrington and Tonsor packed were the following eleven pieces that form the basis for Rini's claim against United: one pair of Chippendale mirrors; one Mezzotint of the Virgin Mary; one Ivory crucifix; three silk embroideries on paper, *St. Jerome, Jesus* and *St. John;* and four small paintings, *Soldiers Gaming, Boy Smoking, Landscape* and *Shoemaker or Boy Sewing* (collectively referred to as "the missing art work"). Tonsor then created an inventory of all the items going to Northampton, specifically noting the boxes that contained the art work.

On August 21, 1990, Nilson van driver T.C. Jenkins ("Jenkins") and two loaders placed all the boxes designated for Northampton in his van, including those containing the art work, and departed Rini's Myrtle Beach house. Jenkins had the responsibility to deliver all of Rini's goods, including the packed art work, to plaintiff's new home in Northampton, Massachusetts.

### B. *Transportation and Unloading of Rini's Goods*

Jenkins drove to Columbia, South Carolina, where the van was parked for two days in a storage facility. On August 24, 1990, Jenkins took the van from the storage facility to another location in Columbia, South Carolina, where he loaded another party's household goods into the van with Rini's belongings. Jenkins then drove both loads to Massachusetts. He arrived at Rini's house on August 27, 1990, positioned his van outside Rini's house, opened the double doors in the center of the van and proceeded to unload over a six- to eight-hour period.

During the unloading process, Jenkins became ill and slept in his van for some time, leaving others to unload without his supervision. Also during this time Jenkins vomited in one of plaintiff's bathrooms, leaving Rini and her daughters to clean up the mess when it was discovered the next day. While Jenkins slept, the van doors remained open and his co-workers continued to unload boxes from the van.

At the conclusion of the unloading process, Rini discovered that some of the boxes containing her art work appeared to be missing and immediately advised Jenkins. Jenkins attempted to locate all the boxes identified on United's inventory sheets but was unable to do so. For instance, Jenkins could not locate "Orange Box # 77" which, according to United's inventory, had been packed by United's packers and contained several pieces of Rini's missing art work.

At the end of a long day, Jenkins demanded that Rini sign the inventory sheets *before* she opened any boxes, despite both the unresolved questions regarding the missing items and Rini's request first to inspect the boxes. Jenkins insisted that the apparently missing boxes must be somewhere in the stacks and piles in Rini's house; he refused to search for them and refused to leave plaintiff's house until she signed for the delivery. His only assistance was to permit Rini to inspect his now half-empty van to confirm that, at least, none of her belongings remained there.

Having observed the witnesses and heard the testimony, this court finds that Jenkins was deliberately belligerent and intimidating in his manner towards plaintiff. Because of this, and being exhausted from the day's work, Rini signed United's inventories. She did, however, indicate on these papers that boxes were missing. Jenkins did not advise Rini to make any additional notations on the inventory sheets. Rini also signed, under pressure from Jenkins, the Delivery Acknowledgement Box on United's Bill of Lading. The incomplete inventory sheets were incorporated by reference into that Bill of Lading. Rini was not advised that she should make notations on the Bill of Lading concerning United's apparent failure to deliver some of her household goods.

On August 28, 1990, Jenkins proceeded to Wellesley, Massachusetts, where he dropped off the second half of his load. On that same day, Rini and her family opened the boxes United had delivered and positively determined that the eleven pieces of art work were missing.

## C. *The Claims Process*

Rini filed a claim for her missing art work on October 2, 1990. From that day forward, this court finds, defendant and its employees deliberately engaged in a pattern of unfair and deceptive practices in an effort to compel plaintiff to abandon a claim that they knew, or should have known, was valid. In fact, as the testimony well demonstrated, and as the jury found, painful as the loss of the art work was, that injury paled in comparison to the abuse meted out by United in the claims process.

In the claim submitted to United, Rini identified the missing art work in detail. Although she had never had these family heirlooms appraised, she estimated their value at $134,000.00. On October 12, 1990, Rini provided United with slides of ten of the eleven missing pieces.[2]

Rini's claim was assigned to United Claims Adjuster, Eric Hartman ("Hartman"), who worked at United's worldwide headquarters in Fenton, Missouri. On October 31, 1990, Hartman first informed Rini that he was investigating her claim. By letter dated November 1, 1990 he assured Rini that he would be conducting a "thorough investigation" of her claim. He also requested that Rini substantiate the value of her art work by presenting canceled checks, credit card receipts, recent appraisals, insurance riders, cash receipts or similar paperwork. In response to that letter, Rini informed Hartman that no such documentation existed beyond the photos already sent, and a family letter dated from 1929, which reflected the authenticity of some of the art work.

This is perhaps a good point to comment on United's persistent demand for documentary substantiation of the value of the lost goods. Perhaps some families do carefully maintain old receipts for family heirlooms, or have these cherished articles appraised regularly for insurance purposes. Many families, however—probably most—do not do this. It is unreasonable to expect all families to manage their affairs with such meticulousness, and it is unfair of United to deny compensation to families that cannot provide this kind of pre-loss documentation. The unfairness for Rini and her family, of course, went much further. As will be seen, plaintiff eventually paid to obtain professional appraisals of her art work, based upon excellent photographs of the works, and supplied these to United. Defendant's reply to this effort was a magnificent Catch–22: they would not accept appraisals unless they were based upon *actual examination* of the physical objects. Given that plaintiff was asserting a claim for items lost or stolen by United's employees, the objects were by definition unavailable to be examined—leaving defendant *ipso facto* off the hook, at least by its logic.

Defendant maintained this ludicrous position throughout trial despite the testimony of *its own* trial expert that fair and reliable estimates of value are commonly obtained through examination of photographs such as those supplied by plaintiff. United's continual demands for non-existent pre-loss documentation, knowing that such papers did not exist, was a flat sham to justify denial of a valid claim. Its refusal to consider reasonable alternate methods for determining the value of the lost items was clear proof of its bad faith. Moreover, if United were going to insist on such a policy, it had an obligation to *inform* its customers of it, so they could consider obtaining appraisals before subjecting valuable unappraised belongings to risk of loss in transport.

Meanwhile, despite Hartman's promise, and his obligation, to conduct a thorough investigation of Rini's claim, he did no such thing. He failed to interview Holston in a timely fashion, failed to obtain a written statement from Jenkins, and failed even to contact the loaders in Myrtle Beach. In addition, he failed to investigate whether any of Rini's missing art work had been mistakenly unloaded at one of the locations Jenkins'

**2.** Rini advised United that she did not have slides of the Mezzotint.

van stopped at before Northampton, failed to contact the unloaders in Northampton and failed to inquire as to whether any of Rini's missing art work had been mistakenly unloaded in Wellesley, Massachusetts.

These were not mere errors of form. At trial, for example, Herrington (one of the loaders in Myrtle Beach) testified that although he recalled packing the art work, he had no clear recollection of the specific nature of that art work. He stated that he might well have been able to recall Rini's art work more clearly if United had interviewed him in the fall of 1990, but such an interview was never attempted. In sum, Hartman intentionally misrepresented that he was conducting a thorough investigation, when in fact he was doing next to nothing. His primary goal was to set up Rini's claim for rejection by making demands for documentation that, he was repeatedly told, did not exist.

This intent was clearly documented during a meeting on January 14, 1991, a few months after plaintiff made her claim. The meeting was attended by Hartman with United's in-house lawyers and management to discuss Rini's claim. At this time, all parties agree, the investigation of the claim was at an early stage. No objective basis existed to deny or allow the claim. Nevertheless, after this meeting, Hartman wrote a note to himself regarding the Rini claim: "Maintain denial after talking to packers." In fact, as it turned out, he maintained denial *without* talking to the packers or anyone else. The notation demonstrates United's willful intent to deny Rini's claim regardless of its legitimacy.

Hartman formally declined Rini's claim *in toto* on July 8, 1991, on the following three grounds: (1) all items given by Rini to United were delivered and signed for on the Bill of Lading without a notation indicating missing items; (2) United had not received documentation to substantiate Rini's claim for $134,000.00; and (3) United's investigation had not uncovered any evidence that Rini's

goods were not delivered to Northampton. All three of these reasons are specious.

First, defendant's own inventory sheets would have confirmed, had Hartman examined them, that all plaintiff's property was not received. A discussion with Jenkins would have provided United evidence to show that he was ill and inattentive at the unloading and that plaintiff was intimidated into signing for her possessions before Jenkins or Rini had been able to confirm that they were all safely in the house.

Second, Rini made exhaustive attempts to substantiate the value of the missing art work. She attempted to locate her grandfather's will and appraisal records, she searched her grandfather's law firm for records, and she also looked through the New York Bureau of Records. Rini then hired, at her own expense, two experienced art appraisers, Lewis Sheppard ("Sheppard") and William Hubbard ("Hubbard") to appraise her art work from the same slides that she had provided to Hartman.[3] Sheppard appraised three of Rini's missing paintings at a total value of $10,000.00. Hubbard appraised the three missing embroideries at a value of $45,000.00.

Rini submitted the Sheppard and Hubbard appraisals to Hartman. Hartman did not investigate the credentials of Sheppard or Hubbard, nor did he submit their appraisals to United appraisers for evaluation. Instead, relying on United's purported policy not to accept appraisals based upon anything other than direct physical examination, and United's arbitrary position that (despite their own records) all items had been delivered to Northampton, Hartman flatly refused even to consider the Sheppard and Hubbard appraisals. While it is true that plaintiff's experts' appraisals did not add up to $134,000, they were evidence of substantial loss. Despite them, defendant never offered plaintiff a dime.

Defendant's third argument—that no evidence suggested that the goods were not properly delivered—is simply absurd. Plain-

---

**3.** Sheppard was trained as an appraiser at Sotheby's in New York City, had been curator of Amherst College's Meade Museum of Art for a number of years and had been an appraiser for more than twenty years. Hubbard was a Harvard-educated appraiser with more than thirty years' experience.

tiff and her daughters credibly reported on the missing pieces, and defendant's own documents substantially corroborated them. An adequate investigation, rather than a whitewash, would have disclosed the sloppiness of United's employees and lent further support to plaintiff's claim.

As noted above, Rini never received the ICC's OCP–100 booklet entitled "Your Rights and Responsibilities When You Move," which detailed United's supposed arbitration program. It was not until December 12, 1991, six months after her claim was formally denied, that United first advised Rini of the availability of an arbitration program. Under the terms set forth in the descriptive brochure, invocation of United's arbitration program required Rini to give up any opportunity to present witnesses on her own behalf, and to waive various categories of damages, including consequential damages. Understandably, Rini declined to go this route.[4]

Rini properly served a 93A demand letter on United, detailing United's loss of her art work and her experience with United's claims process, on October 8, 1992. On November 11, 1992, United sent Rini's counsel a letter denying Rini's claim completely without any offer of settlement. In its response, United maintained its position that (a) Rini had signed for her entire shipment without exception and (b) there was no evidence that United had failed to deliver the missing art work. United also took the position that the 93A and common law claims were preempted by the Carmack Amendment. This letter compounded the unfair and deceptive trade practices United engaged in during the claims process. Despite the lack of any even minimal investigation and despite the inventory sheets, which themselves confirmed that at least one box of art work was missing at the time of delivery, United persisted in asserting that Rini had received everything. Other, rather gratuitous rationalizations were layered over these arguments. For example, the letter falsely states "We are informed ... the cartons were stored in an unsecured dormitory building with access prior to being unpacked." This unfounded remark can only be viewed as a deliberate concoction designed to add strength to United's bad faith denial of Rini's claim.

The day after rejecting plaintiff's 93A letter, November 12, 1992, United filed a Declaratory Judgment Action in the United States District Court in South Carolina against Rini, seeking to forestall any legal action by her to obtain redress for loss of her goods and for United's misconduct during the claims process. United contended that it was entitled to judgment in this action because it had conducted a "thorough investigation" of Rini's claim as required by law. *See* 49 C.F.R. § 1005.4 (1992). Rini was compelled to retain counsel to contest the suit, and on February 26, 1993, the South Carolina District Court dismissed United's complaint, ruling that it was not a proper use of the Declaratory Judgment Act.

As plaintiff and her witnesses testified, and as the jury obviously found, United's scorched earth policy in handling this claim caused Rini terrible emotional pain—anguish above and beyond the mere loss of goods covered by the Carmack amendment. She suffered hypertension and high blood pressure; her sleep pattern was interrupted; she lost interest in her academic work. She attended mental health counselling once a week and was eventually diagnosed as suffering from a major depressive episode, requiring medication. As her therapist testified, this suffering stemmed not only from the loss of her family heirlooms, but from the treatment she received from United in the subsequent claims process.

Plaintiff filed her complaint in this court on December 22, 1992. Defendant responded with a motion to dismiss, on the ground of preemption, all causes of action, except the count asserted under the Carmack Amendment, and with a motion to transfer that count to South Carolina. The motion to dismiss was allowed in part by Judge Freed-

---

**4.** United never itself agreed to, or even explicitly proposed, arbitration. It only informed plaintiff of the existence of the program. Given United's decision to "maintain denial" in January 1991, it is hard to imagine United itself agreeing to arbitrate at all or, if it did agree, participating in good faith.

man, with regard to any non-Carmack claims seeking damages for loss of the goods in transport, and was otherwise denied.

The defendant persisted with the preemption argument by filing a motion for summary judgment at the close of discovery and by objecting repeatedly during the trial to any evidence supporting claims for damage on any basis except the Carmack Amendment. The defendant maintained this position despite the fact that the court agreed that the Carmack Amendment provides the exclusive avenue for recovery of damages based on the loss of the goods. In the ruling on defendant's motion for summary judgment at the close of discovery, common law causes of action were permitted *only* to the extent that they were anchored on allegations of damage independent of any loss of the goods.

### D. *Trial*

At trial, the court tightened the limitation on the non-Carmack causes of action further. Over plaintiff's objection the court refused to send to the jury any claims under the common law relating to actions by United or its employees occurring *before* plaintiff's property was loaded onto United's van in Myrtle Beach. The alleged misrepresentations by United employees prior to loading, the court found, were too intertwined with the delivery process itself to avoid the Carmack Amendment's preemptive sweep. The jury was permitted to consider the common law counts only as regards the claims process *after* the delivery of the goods and only as regards injury unrelated to the loss of the goods *per se*. The claims process, the court found, was entirely independent of the transport of the goods and involved damages clearly separate from those generated by their loss.

The distinction drawn by this court is explicitly supported by decisional law from this district. *Urban Elec. Co., Inc. v. Cable Index*, 735 F.Supp. 29, 32 (D.Mass.1990); *Mesta v. Allied Van Lines Intern. Inc.*, 695 F.Supp. 63, 65 (D.Mass.1988); *Sokhos v. Mayflower Transit, Inc.*, 691 F.Supp. 1578, 1581 (D.Mass.1988).

More importantly, the First Circuit Court of Appeals has recently accepted, by implication, the same distinction between Carmack-preempted and independent claims. *See Fredette v. Allied Van Lines, Inc.*, 66 F.3d 369 (1st Cir.1995). In *Fredette* the First Circuit affirmed a jury award of $18,500 under the Carmack Amendment for loss of goods, and of $7,500 for breach of contract and $10,000 for intentional infliction of emotional distress. Although the common law claims in *Fredette* were much more closely entwined with the Carmack claim than Rini's claims are here, Judge Boudin's opinion makes no reference to any potential preemption of these common law claims.

Testimony in this case began on December 5, 1994 and concluded on December 14, 1994. At trial, United maintained the same conflicting and often fatuous defenses. First, United suggested that Rini never gave the art work to United, because she either mistakenly or intentionally left it behind at her Myrtle Beach home. Second, United asserted that even if Rini had given the art work to United, United's employees had delivered it to her in Northampton. Third, even if United had failed to deliver the art work to Northampton, she could not prove it had any value because she only had photographs of the art work at issue and appraisals based on those photographs. Fourth, even if the missing art work could be appraised from photographs, Rini's appraisals were inflated.

The defense strategy seemed to be to offer any argument theoretically available, regardless of its basis in fact. United's own employees testified to seeing and packing the art work. Jenkins, the transporter, testified that he could not locate all the boxes United was supposed to deliver to Rini's house in Northampton. Both Rini and Jenkins testified at trial that all the boxes were delivered to Rini at a secure residence, and not an unsecured dormitory. Moreover, despite United's attempt aggressively to challenge Rini's credibility, her testimony emerged as trustworthy and consistent.

In the early stages of the trial, United's counsel and United's employees vehemently asserted that appraisals through photographs were unacceptable. Yet later at trial, as noted above, United's own witness testified

to the contrary. Karen Keane testified that her gallery routinely made "practical business decisions" concerning the value of art work from photographs of the art work alone. Nancy Smith also testified that she was able to appraise art work from photographs and slides. Smith then testified to specific appraisals for certain pieces of Rini's missing art work.

In response to special interrogatories, the jury found United liable for loss of plaintiff's art work under the Carmack Amendment and awarded Rini $50,000.00 in compensatory damages. The jury declined to award plaintiff any damages for emotional distress based on the loss of her goods. The jury also found that United was negligent in conducting its claims process and that United made intentional misrepresentations during that claims process. Significantly, the jury specifically found that this negligence and intentional misrepresentation was a proximate cause of injury to the plaintiff *other than* injury arising from the loss of her goods. On these two claims the jury therefore awarded Rini a total of $100,000.00.[5]

The court's task now to is to determine the appropriateness of an award of damages under Mass.Gen.L. ch. 93A and the amount properly to be awarded, if any.

### III. *CONCLUSIONS OF LAW*

Preliminarily, the court rejects defendant's argument that the 93A claim in this case is preempted by the Carmack Amendment. The Carmack Amendment only provides a remedy for damages arising from the loss of goods during transport. In the November 21, 1994 ruling on defendant's motion for summary judgment on this point, the court found that plaintiff's claims under 93A were based on alleged misconduct by United not undertaken in the course of transporting goods. As with the common law counts, the scope of the 93A count was further constricted at trial: only conduct by United taking place *after* the incomplete shipment of the

goods to Northampton, occurring during the claims process, has been considered by this court as a basis for the 93A claim.

Having established that the 93A claim is outside the Carmack Amendment's preemptive reach, the court must address this claim from two angles. First, is defendant exempt from the statute's reach? Second, if so, do defendant's actions justify an award of damages under 93A?

### A. *Exemption under § 3 of Mass.Gen.L. ch. 93A*

United maintains that the transactions at issue in this case are subject to the regulatory authority of the Interstate Commerce Commission and are therefore exempted under § 3 of Mass.Gen.L. ch. 93A. Section 3 provides:

> Nothing in this chapter shall apply to *transactions or actions otherwise permitted* under laws as administered by any regulatory board or officer acting under statutory authority of the Commonwealth or of the United States.

> For the purpose of this section, the burden of proving exemptions from the provisions of this chapter shall be upon the person claiming the exemptions.

(Emphasis supplied).

■ Defendant's burden is heavy. To sustain it, "a defendant must show more than the mere existence of a related or even overlapping regulatory scheme that covers the transaction. Rather, a defendant must show that such scheme affirmatively permits the practice which is alleged to be unfair or deceptive." *Bierig v. Everett Square Plaza Associates*, 34 Mass.App.Ct. 354, 367 n. 14, 611 N.E.2d 720 (1993), quoting Greaney, Chapter 93A Rights and Remedies 6–4 (1992). The rationale behind the exemption is to ensure that a business is not subjected to 93A liability if it relies on activity permitted by law.[6]

---

5. The jury found Rini 30% contributorily negligent on the negligence claim. This finding does not affect the damage award, however, since Rini is entitled to full damages on the misrepresentation claim.

6. *See, e.g., Ward v. Dick Dyer & Assoc., Inc.,* 304 S.C. 152, 403 S.E.2d 310 (1987).

■ To determine whether defendant's actions are exempt, the court must first examine the "transactions or actions" at issue. Here, Rini submits that they are defendant's actions in the claim settlement process, including: United's decision to deny her claim; United's inadequate investigation of her claim; United's intentional misrepresentations during the claims handling process; United's refusal to offer any compensation in response to her 93A demand letter, and United's decision to seek declaratory judgment.

■ Defendant maintains that its "actions" are not only permitted but required by the rules and regulations of the I.C.C. implementing the provisions of the Interstate Commerce Act and published in United's tariffs filed with the I.C.C. In fact, these regulations permit no such activities.[7] There is no regulation or agency that permits a common carrier to mislead its customers in the claims settlement practices. *But cf. Bierig*, 34 Mass.App.Ct. 354, 611 N.E.2d 720 (landlord exempt from 93A liability in suit brought by tenants for excessive rent because the rents charged were expressly permitted by a regulatory scheme).

Defendant relies heavily on *Carr v. United Van Lines Inc.*, 289 S.C. 194, 345 S.E.2d 734 (Ct.App.1986). *Carr* has no persuasive force, however, and in fact lends further support to Rini's position. In *Carr*, plaintiffs alleged that a provision in their shipping agreement was deceptive in violation of the South Carolina Unfair Trade Practices Act. However, in *Carr* the very contractual provisions that gave rise to Carr's alleged cause of action were taken directly from tariffs approved by the I.C.C. As such, the court held that because the conduct was specifically authorized and permitted under regulation and tariffs administered by the I.C.C., the transaction was exempt from liability under the South Carolina statute. *Carr*, 345 S.E.2d at 737.

It is clear that the I.C.C. does regulate many areas for motor carriers. However, as Justice Greaney has pointed out, the mere existence of a regulatory statute does not preclude the applicability of a broader non-conflicting statute such as 93A. *See also DePasquale v. Ogden Suffolk Downs, Inc.*, 29 Mass.App.Ct. 658, 662, 564 N.E.2d 584 (1990). In fact, the activities at issue here are of a different kind and character than those regulated by the I.C.C. *See Tousley v. North American Van Lines, Inc.*, 752 F.2d 96, 104 (4th Cir.1985) (carrier's transactions were subject to state unfair practices statute even though it was also subject to regulation by the I.C.C.).

United's trade practices during its claims settlement process are not exempt from the reach of § 3 of Mass.Gen.L. ch. 93A. The activities at issue are not specifically or even generally permitted by any regulatory authority. As such, 93A is an appropriate remedy.

### B. *93A Violation and Multiple Damages*

■ Chapter 93A, § 2(a) makes unlawful any "unfair or deceptive acts or practices in the conduct of any trade or commerce." To establish unfair and deceptive trade practices, plaintiff must show that defendant's conduct fell within "the penumbra of some common-law, statutory or other established concept of unfairness, or was immoral, unethical, oppressive or unscrupulous." *Cambridge Plating Co., Inc. v. NAPCO, Inc.*, 876 F.Supp. 326, 336 (D.Mass.1995) (citation omitted).

■ United failed to conduct a thorough, fair and unbiased investigation. It made intentional misrepresentations to the effect that it was directing such an investigation, when in fact it was conducting a sham designed to wear plaintiff down and force her to abandon a legitimate claim. It refused to make any offer in response to Rini's 93A demand letter, and it persisted in incessant demands for non-existent documentation in the teeth of its own expert advice. Whether considered singularly or cumulatively these acts were taken in bad faith and were unethical. They are more than sufficient to war-

---

**7.** Concededly, the I.C.C. does require that claims be "promptly and thoroughly" investigated. But this overlapping regulatory requirement, which in any event was not remotely satisfied, can hardly be described as "affirmatively permitting" the abuse meted out to plaintiff here.

rant a finding of unfair and deceptive trade practices in violation of 93A.

Chapter 93A, § 11 compels an award of "up to three, but not less than two, times" actual damages if the court finds that defendant's practices were a "willful or knowing violation." The multiple damages provision is intended to "deter businesses from knowingly engaging in deceptive trade practices by increasing the magnitude of potential liability and providing an incentive to victims of such practices to avail themselves of these legal remedies." *Computer Systems Engineering, Inc. v. Qantel Corp.,* 571 F.Supp. 1365, 1378 (D.Mass.1983). This section also seeks to promote reasonable settlements, *see Nader v. Citron,* 372 Mass. 96, 100, 360 N.E.2d 870 (1977), and to make it "unprofitable" for a defendant to ignore meritorious claims. *International Fidelity Ins. Co. v. Wilson,* 387 Mass. 841, 857, 443 N.E.2d 1308 (1983) (citation omitted).

The term " 'willful', is most reasonably interpreted as referring to a state of mind existing at the time of acting—a state of mind involving 'culpability' at least. . . ." *Qantel,* 571 F.Supp. at 1374; *Cf. International Fidelity,* 387 Mass. at 853, 856, 443 N.E.2d 1308.[8] Hartman's 1991 notation to "maintain denial" of Rini's claim before it had even been assessed, and defendant's continued denial of her claim even though the inventory sheets clearly indicated that boxes were missing was (1) knowingly designed to be unfair and deceptive and (2) a willful violation of 93A designed to erode her morale. The court can only wonder at the number of other legitimate claimants whose efforts at redress have been defeated by these tactics.

■ Having found a willful or knowing violation of 93A, it is within this court's discretion to award anywhere from double to treble the actual damages. *International Fidelity,* 387 Mass. at 853, 443 N.E.2d 1308; *Cambridge Plating,* 876 F.Supp. at 346. The decision is to be "[b]ased on the egregious-

ness of [the] defendant's conduct." *Brown v. LeClair,* 20 Mass.App.Ct. 976, 979, 482 N.E.2d 870 (1985). Rini relied on United, and United deceived and manipulated her. More than four years after losing Rini's art work, United aggressively contested her claim at every stage of the pretrial and trial process, forcing the expenditure of substantial attorney and expert fees. Unless deterred, United will not alter its egregiously unfair tactics. Given the degree of culpability, this court will award treble damages under 93A.

Courts have also awarded treble damages where, as here, there has been a bad faith settlement offer. *See Heller v. Silverbranch Const. Corp.,* 376 Mass. 621, 628, 382 N.E.2d 1065 (1978); *LeClair,* 20 Mass.App.Ct. at 979, 482 N.E.2d 870; *Brandt v. Olympic Const., Inc.,* 16 Mass.App. 913, 916, 449 N.E.2d 1231 (1983). The conduct proscribed by 93A is as much the failure to make a reasonable settlement offer as it is a substantial violation of the statute. *International Fidelity,* 387 Mass. at 857, 443 N.E.2d 1308. The court's finding of bad faith in responding to plaintiff's demand letter constitutes further grounds to award treble damages. *See LeClair,* 20 Mass.App.Ct. at 979, 482 N.E.2d 870.

As noted above, the jury awarded the plaintiff $100,000 in damages for injury suffered by her as a result of the defendant's negligence and misrepresentation during the claims process, finding that this injury was separate from injury arising from the loss of her goods. This court agrees with the jury that $100,000 is a fair and reasonable award of damages for defendant's unfair and deceptive practices during the claims process. For the reasons set forth above, this amount will be trebled. Since the award of damages by the jury on the negligence and misrepresentation claims covers the same injury as the award of damages by this court on the 93A claim, the court will award only $300,000 to

**8.** In *International Fidelity,* the court observed: Chapter 93A ties liability for multiple damages to the degree of the defendant's culpability by creating two classes of defendants. The first class is those defendants who have committed relatively innocent violations of the statute's substantive provisions. These defendants are not liable for multiple damages. The second class is those defendants who have committed "willful or knowing" violations. 387 Mass. at 853, 443 N.E.2d 1308 (citation omitted).

**234**

compensate plaintiff for all injuries suffered by her in the claims process.

The award of $50,000 in damages under the Carmack Amendment is not subject to trebling. Since these damages in no way duplicate the award of damages under ch. 93A, the court will order entry of judgment for the plaintiff in the total amount of $350,-000 for all her injuries. As noted above, plaintiff is also entitled to reasonable attorneys' fees and costs incurred with respect to the 93A and Carmack Amendment claims, as well as prejudgment interest on a portion of her claims. These will be addressed in a separate memorandum.

### IV. CONCLUSION

For the reasons set forth above, the court will order entry of judgment against United in the sum of $350,000.00.