**CABLEVISION OF BOSTON, INC., Plaintiff,**

v.

**PUBLIC IMPROVEMENT COMMISSION OF THE CITY OF BOSTON, et al., Defendants.**

**No. 98–12531–MLW.**

United States District Court, D. Massachusetts.

Jan. 27, 1999.

J. Anthony Downs, Stephen D. Poss, Michael K. Murray, Goodwin, Procter & Hoar, Boston, MA, for Cablevision of Boston, Inc.

Merita A. Hopkins, Boston, MA, for Public Improvement Commission of the City of Boston, Joseph F. Cassazza, Michael Galvin, Gary Mocia, Para M. Jayasinghe, Stephen Shea, City of Boston.

Roscoe Trimmier, Ropes & Gray, Boston, MA, for Boston Edison Co.

Michael J. McHugh, Rich, May, Bilodeau & Flaherty, Boston, MA, for Becocom, Inc., RCN Telecom Services of Massachusetts, Inc., RCN Corp.

Roscoe Trimmier, Ropes & Gray, Boston, MA, Michael J. McHugh, Rich, May, Bilodeau & Flaherty, Boston, MA, for RCN–Becocom, LLC.

## MEMORANDUM AND ORDER

WOLF, District Judge.

This memorandum is based upon the transcript of the decision rendered orally on January 22, 1999, expressing the court's intention to deny Cablevision of Boston, Inc.'s ("Cablevision") Motion for Preliminary Injunction. This memorandum adds citations, deletes some colloquy, clarifies some language, and represents the court's decision in this matter for the purpose of any possible appeal.

\* \* \* \* \* \*

Upon consideration of the literally voluminous pleadings and exhibits, and of the testimony and argument at the six-hour hearing on Cablevision's Motion for Preliminary Injunction, that motion is being denied.

### FINDINGS OF FACT

I find the basic facts to be as follows. I will refer to certain additional facts as they are relevant in the explanation of my analysis of the applicable law.

Plaintiff Cablevision has for many years provided cable television services in the City of Boston. Affidavit of Richard S. Hahn ("Hahn Aff.") ¶ 38. Until recently, it enjoyed a statutory monopoly. *Id.* It still has about 97 percent of the market. *Id.* The private defendants in this case have about three percent of the Boston cable television market. *See id.*

Defendant Boston Edison Co. is a public utility which has for more than a hundred years provided electricity to Greater Boston. *Id.* at ¶ 7. In order to do so, it has built, among other things, a large network of underground conduit for cable, used to transmit electricity and, to a limited extent, to transmit communications relating to the delivery of electricity. *Id.* at ¶ 9.

Defendant Public Improvement Commission of the City of Boston (the "PIC") is a division of the City's Department of Public Works. Defendant Joseph Casazza is its Chairman. The PIC is responsible for construction projects involving the City streets. As part of this, the PIC administers a process to permit the construction of new conduit under the City streets and to record its location. It does that pursuant to M.G.L. c. 166, § 22, which provides municipalities the power to issue what are called "grants of location" for new conduit and establishes the legally required procedure for doing so. Although it is not clear to the court at this point what empowers the PIC to do so, the PIC also records the uses to which authorized conduit is to be put and records amendments to such uses.

In February 1996, a new federal telecommunications statute was enacted. It is known as the Telecommunications Act of 1996, (the "TCA"), 47 U.S.C. § 151 et seq. The proposed statute was the subject of lengthy debate. In essence, it provided for a revolutionary deregulation of the telecommunications industry. See 142 Cong. Rec. H1078 (daily ed. Jan. 31, 1996) (H.R.Conf.Rep.104–458). The goal of the TCA was to create competition in the provision of telecommunications services, including video services. S.Rep. No. 104–23, at 1–2 (1995).

The TCA is premised on the philosophy that vigorous competition will serve consumers by providing wider choices, better service, and lower prices. Id. at 7. In enacting the TCA, Congress and the President specifically anticipated that electric utilities, which already had networks of conduit and fiber-optic cables, would become competitors to existing cable television operators. Id. Since enactment of the TCA, Congress has encouraged and, when it has occurred, applauded the entry of utilities into the cable television market. See Federal News Service, Competition Among Video Delivery Systems: Hearing of the Telecommunications, Trade and Consumer Protection Subcommittee of the Committee (July 29, 1997) ("Federal News Service") at *32.

In the anticipation of the TCA, in 1995, Boston Edison told Casazza that it intended to use its existing conduit under the City's streets to compete in the telecommunications business when the federal law was changed to deregulate the industry. Hahn Aff. ¶ 28. Casazza told Boston Edison that he did not believe that the PIC's policy for building new conduit was applicable to Boston Edison's proposal. Id. at ¶ 29. The PIC's policy for constructing new conduit was adopted in 1988. Affidavit of Joseph F. Casazza ¶ 4. It provides that, in order to minimize future disruption to the streets, parties seeking to install new conduit must build additional, empty shadow conduit that can be employed if future demand increases, and also open their project to other service providers who may wish to participate. Policy Relating to Grants of Location for New Conduit Network for the Provision of Commercial Telecommunications Services ("Policy for New Conduit") at ¶ 12.

Boston Edison's request and the foreseeable possible deregulation of the telecommunications industry prompted Casazza to begin to consider developing a new PIC policy concerning changes in the use of existing conduit under City streets. Hahn Aff. ¶ 29; Tr. of Prelim. Inj. Hr'g ("Tr.") at 213–14 (Jan. 20, 1999). Casazza convened a small group of potentially interested parties, including Boston Edison. Hahn Aff. ¶ 30; Tr. at 213. In April 1996, that group furnished Casazza with a proposed possible policy for changes in the use of existing conduit. Hahn Aff. ¶ 30.

That proposed policy provided, among other things, for the submission of plans to the PIC, by utilities, identifying the location of all existing cable and conduit that were intended to be utilized for commercial telecommunications purposes. Proposed Application of the City of Boston Fiber Optic Conduit Policy to Existing and Newly Constructed Non–Commercial Telecommunications Utility Cable and Conduit

at 1. The proposed policy would also have required a utility to petition the PIC for an amendment to its grants of location for the cable and conduit that it intended to use for commercial telecommunications purposes. *Id.*

Casazza, however, did not act on the proposed policy. Tr. at 215. He did nothing with regard to it, in part because the recently-enacted TCA would require the City to consider issues of telecommunication policy much more broadly and that was not the PIC's function. *Id.* at 216–17, 221–22.

Casazza had been told of Boston Edison's concept of converting its conduit and cable to telecommunications use and also informed of Boston Edison's initial planned project. *Id.* at 211, 220. He did not, however, know all of Boston Edison's plans. *Id.* at 211. Casazza did not feel that Boston Edison or anyone else was required to follow the possible proposed policy that would have required prior notice and action by the PIC before new cable could be added to existing conduit or existing cable could be converted to telecommunications use. *Id.* at 214–15.

From 1996 to 1998, Casazza, as Chairman of the PIC, did not believe that Boston Edison was adhering to that proposed policy. *Id.* at 211, 213–15. Contrary to Cablevision's contention, Casazza and the PIC were not misled by Boston Edison concerning the conversion of its conduit. *Id.* at 202.

Following enactment of the TCA, in 1997, Boston Edison organized defendant BecoComm as a vehicle for engaging in the non-regulated telecommunications business. Hahn Aff. ¶ 9. It is the business of BecoComm to construct telecommunications fiber-optic systems for other entities which wish to use Boston Edison conduit, which are also known as "rights of way." *Id.* at ¶ 21.

Defendant RCN Corporation is a holding company which includes defendant RCN Telecom Services, Inc. Affidavit of Scott Burnside ¶ 1. RCN Telecom Services, Inc. provides cable, telephone and Internet services. *Id.* In September 1996, BecoComm and RCN formed a joint venture, the defendant RCN–BecoComm, LLC (the "Joint Venture"), which provides telecommunication services, including cable television, to customers in Boston and adjoining cities. Affidavit of Michael Adams ¶ 4. The Joint Venture and Cablevision are direct competitors.

The press release announcing the formation of the Joint Venture stated that the Joint Venture would utilize Boston Edison's network of fiber-optic cable. *Boston Edison and C–TEC's RCN Unit Form Partnership to Offer Local Phone, Long Distance, Video and Internet Access,* Press Release (Sept. 30, 1996). At various times, additional fiber-optic cable has been added to Boston Edison's conduit for use by the Joint Venture. Affidavit of Ralph J. Canina ¶ 7; Affidavit of Paul Knizer ("Knizer Aff.") ¶ 7.

Casazza was generally aware that this was being done. Tr. at 205–208. Cablevision was also generally aware that this was being done.

In August 1997, Cablevision complained to the Massachusetts Department of Public Utilities, which has since been renamed the Massachusetts Department of Telecommunications and Energy (the "DTE"), that according to public documents, the Joint Venture was currently using "Boston Edison's fiber optic network, rights of way, plant facilities, and name." *In re: Application of Boston Edison Co.,* DPU 97–63, Reply of Cablevision Systems Corp. to Mtn. of Boston Edison Co. to Clarify Scope of Proceeding, at 3 (Aug. 20, 1997).

In early 1998, a representative of the Joint Venture and a representative of Cablevision discussed the use of Boston Edison's conduit and cable. Hahn Aff. ¶ 20; Affidavit of John E. Shepard, Jr. ¶ 2. Cablevision also knew that the Joint Venture began providing cable television services to the Long Wharf Marriott Hotel in Boston,

and understood that this required the installation of some new fiber-optic cable in Boston Edison conduit. Knizer Aff. ¶ 7.

Cablevision did not until recently know the full scope of the Joint Venture's activities with regard to Boston Edison conduit. *See* Letter from Kathleen Mayo to Richard Hahn (Dec. 4, 1998). Nor did Cablevision ever ask Boston Edison or otherwise seek that information until it was about to initiate this suit. *Id.* In fact, Boston Edison offered Cablevision the opportunity to use the Boston Edison conduit system for telecommunications purposes before Boston Edison began dealing with RCN, but Cablevision said that it was not interested. Hahn Aff. ¶ 20.

Although Cablevision has begun to provide telecommunications services, such as telephone, in addition to cable television services in other states, it has not yet done so in Massachusetts. Supplemental Affidavit of Kathleen Mayo ¶ 3. It has, however, recently begun to plan and to invest to provide additional services in Boston. *Id.* at ¶¶ 3–5.

In the summer of 1998, Casazza informed Boston Edison that it would have to obtain from the PIC amended grants of location to reflect that its conduits were being used for more than electrical cable. *See* Hahn Aff. ¶ 34. It is not clear to the court at this time what the legal authority is for requiring such an amendment. In any event, Casazza did not view this matter as an approval process. Tr. at 216–18. Rather, he viewed this as a process that would be useful to the City because it would provide the information necessary for the City to know what was under its streets. *Id.*

In a series of public meetings beginning in September 1998, the PIC granted Boston Edison and BecoComm amended grants of location reflecting the new uses to which some of Boston Edison's conduit had been put. *Id.* at 218. In doing so, the PIC did not consider the competitive effects of the amended grants of location. *Id.* at 223–24.

Beginning in 1998, the PIC applied the same approach to Bell Atlantic, a telephone utility which had previously installed new fiber-optic cable in its conduits. *Id.* at 199–202, 218. Acting on five to ten Bell Atlantic petitions, the PIC recorded amended grants of location for Bell Atlantic reflecting the expanded telecommunications uses of its conduits. *Id.* at 200–02, 204–05.

Cablevision has initiated or participated in a number of legal actions against the Boston Edison-related defendants since the Joint Venture with RCN was formed. *See Investigation by DPU, on its Own Mot., of Boston Edison's Compliance with DPU 93–97,* DPU 97–95, Opening Order (Oct. 10, 1997); *Cablevision of Boston v. Boston Edison Co.,* DPU/DTE 97–82, Order on Scope of Proceeding (Feb. 11, 1998); *Boston Edison Holding Co. Pet.,* DPU/DTE 97–63, Final Order (Apr. 17, 1998), *appeal dismissed,* 428 Mass. 436, 439, 702 N.E.2d 799 (1998); *Standards of Conduct Rulemaking,* DPU 97–96, Final Order (May 29, 1998). Each of those actions has sought relief that would injure the Joint Venture's ability to compete with Cablevision, among others.

On December 14, 1998, this suit was filed. It asserts that the defendants have violated 47 U.S.C. § 253 and M.G.L. c. 93A, §§ 2 and 11. In the complaint, Cablevision asks the court to invalidate the amended grants of location that the defendants have received since September 1998 and to prohibit the furnishing to the defendants of any additional grants of location or amended grants of location. Compl. at 39, ¶ II.A.(i). The complaint also requests that the defendants be enjoined from obtaining any additional grants of location for one year. *Id.* at 39, ¶ II.A.(ii).

With the complaint, Cablevision filed a Motion for a Temporary Restraining Order. After a conference with the court, the parties entered into a Consent Order, essentially agreeing that the Boston Edison-related defendants would maintain the

status quo until January 28, 1999, in order to provide the court an opportunity to receive submissions, hold a hearing, and decide what would be addressed as a Motion for Preliminary Injunction. Stipulation and Order (Dec. 23, 1998).

With regard to the Motion for Preliminary Injunction now being decided, the plaintiff requests that the court order that, until this case is resolved, the City not grant the private defendants any additional or amended grants of location for telecommunications purposes, and that the private defendants not install any new fiber-optic cable or put existing cable to new uses. Pl.'s Proposed Order ¶¶ 1.a, 2.a & b (submitted with Pl.'s Reply Mem. of Jan. 12, 1999). Such a preliminary injunction would, during the pendency of this case, prevent the private defendants from competing with Cablevision by seeking new business or preparing to service such business.

As I indicated earlier, the parties filed lengthy briefs, many affidavits, and numerous exhibits. The court conducted a six-hour hearing on January 20, 1999. The hearing included the testimony of several witnesses.

*ANALYSIS*

A. *The Preliminary Injunction Standard*

 The standard for obtaining a preliminary injunction is familiar. *Ocean Spray Cranberries, Inc. v. Pepsico, Inc.*, 160 F.3d 58, 60 (1st Cir.1998). The burden of proof is on the plaintiff. *Id.; Equal Employment Opportunity Comm'n v. Astra USA, Inc.*, 94 F.3d 738, 742 (1st Cir. 1996). The court is required to weigh four factors. *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996); *Astra*, 94 F.3d at 742. The first is whether the plaintiff has shown a likelihood of success on the merits. *Ross–Simons*, 102 F.3d at 15. The second is whether the plaintiff has established an imminent threat of irreparable harm in the absence of a preliminary injunction. *Id.*

The court is also required to balance the hardship to the plaintiff if no injunction is issued against the hardship to the defendants if the requested injunction is ordered. *Id.* In addition, the court must consider the effect of the proposed injunction on the public interest. *Id.*

 As the Court of Appeals for the First Circuit has said on a number of occasions, the likelihood of success on the merits is of primary importance. *Id.* at 16 (citing cases). It is the *sine qua non* for obtaining a preliminary injunction. *Gately v. Commonwealth of Mass.*, 2 F.3d 1221, 1225 (1st Cir.1993); *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir.1993). If a great showing of likely success on the merits is made by a plaintiff, a reduced showing of irreparable harm may be appropriate. *Ross–Simons*, 102 F.3d at 19; *Astra*, 94 F.3d at 743.

 In addition, a preliminary injunction is an equitable remedy. *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944); *see also Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). It does not issue automatically even if the foregoing criteria indicate that an injunction is warranted. *Converse Constr. Co. v. Massachusetts Bay Transp. Auth.*, 899 F.Supp. 753, 760 (D.Mass.1995). Thus, a court may properly consider any inequitable conduct by the plaintiff. The court may also consider any adverse impact on the public interest for which a bond cannot compensate and withhold relief for this reason alone. *Weinberger*, 456 U.S. at 312–13, 102 S.Ct. 1798; *Converse*, 899 F.Supp. at 760.

Fed.R.Civ.P. 65(c) requires a prevailing plaintiff to post a bond to pay for costs and damages that may be suffered by defendants if the defendants later prevail on the merits of the case.

1. *Cablevision is Not Likely to Prevail on Its Federal Claim*

In this case the plaintiff is not reasonably likely to prevail on its federal claim of a violation of 47 U.S.C. § 253.

There is a meaningful question in this case as to whether there is a legal basis for the plaintiff to assert a claim under § 253. There are three possible grounds for such a cause of action argued here. The first is 42 U.S.C. § 1983. The second is an alleged implied private right of action. The third is under the Supremacy Clause of the United States Constitution, Art. VI. cl. 2. As set forth below, at this preliminary point, it appears that the plaintiff is reasonably likely to prove that it has standing to pursue limited relief under the Supremacy Clause. Plaintiff is not, however, likely to prevail with regard to the claim that it has a cause of action for which § 1983 provides a remedy. It is not clear whether the plaintiff is likely to be able to prove that it has an implied private right of action.

 Section 1983 provides a remedy for violations of federal rights. The plaintiff must assert a violation of a federal right, not merely a violation of federal law. *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 1359, 137 L.Ed.2d 569 (1997). When federal rights are involved, there is a presumption that Congress meant to permit private suits seeking relief under § 1983. *Stowell v. Ives*, 976 F.2d 65, 70 n. 5 (1st Cir.1992); *New York Airlines v. Dukes County*, 623 F.Supp. 1435, 1444 (D.Mass.1985).

 The standard for proving a right has three elements. *Blessing*, 520 U.S. at 340–41, 117 S.Ct. 1353. They are: (1) that Congress must have intended the statutory provision to benefit the plaintiff; (2) the plaintiff must demonstrate that the right is not so vague and amorphous that enforcement of it would strain judicial competence; and (3) the statute must unambiguously impose a binding obligation on the state or governmental entity. *Id.; see also Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989); *Stowell*, 976 F.2d at 68; *Playboy Enters., Inc. v. Public Serv. Comm'n*, 906 F.2d 25, 32 (1st Cir. 1990).

 Generally, the Supremacy Clause of the Constitution, Art. VI, cl. 2, does not secure and is not itself a right, privilege or immunity secured by the Constitution. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 613, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979); *New York Airlines*, 623 F.Supp. at 1449.

In addition, it appears at this point that the plaintiff is not likely to be able to prove that, as contended, 47 U.S.C. § 253(c) creates a federal right.

I now assume, without finding, that the plaintiff is likely to be able to prove that the first two elements necessary to establish a right exist. That is, for present purposes, I assume that Congress, in enacting § 253, intended to benefit the plaintiff, Cablevision, among others. As the legislative history, particularly the remarks of Senators Feinstein and Gorton, indicates, in enacting § 253(c) Congress primarily intended to benefit municipalities. *See* 141 Rec. S.8170–71 (1995) (comments of Senator Feinstein); 141 Cong. Rec. S.8306 (1995) (comments of Senator Gorton). Congress, however, also intended the TCA generally to benefit new entrants to the telecommunications business. The Joint Venture here is a paradigm of the new entrant that Congress contemplated. However, Cablevision is also a potential new entrant with regard to telecommunications services in addition to cable television. That may be sufficient to make it one of the intended beneficiaries of the TCA, although not the primary beneficiary of the provision at issue.

 It also appears at this point that the plaintiff is likely to be able to show that, if applicable, a standard of "competitively neutral and nondiscriminatory" is a sufficiently specific standard for a court to enforce. However, at this point, it appears that § 253(c) does not create a federal right because it imposes no mandatory obligation on any state or municipality.

It has been held that a federal statute does not give rise to a § 1983 claim where the statute in question does not create mandatory obligations on the state or local entity. For example, in *Blessing*, 520 U.S. at 343–44, 117 S.Ct. 1353, the Supreme Court held that a requirement that the state operate its child support program in "substantial compliance" with the statute did not create a federal right that individuals could enforce. Similarly, in *Suter v. Artist M.*, 503 U.S. 347, 363, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), the Supreme Court held that where the state was required to use "reasonable efforts," the statute did not unambiguously impose a binding obligation on the state and, therefore, no private right of action existed.

Additionally, in *Stowell*, 976 F.2d at 71, the Court of Appeals for the First Circuit held that a statute requiring that the Secretary of Health and Human Services not approve state plans for medical assistance in certain circumstances did not create a right for the purpose of determining whether a private right of action for which § 1983 provides a remedy exists. Indeed, in *Stowell*, the court wrote: "Without exception, those cases [finding a right for which § 1983 provides a remedy] concern statutes that pin hard-and-fast obligations on the States." *Id.*

In this case, Cablevision claims that 47 U.S.C. § 253(c) is the source of the purported right for which § 1983 provides a remedy. Section 253(c) must be read in the context of § 253(a). Section 253(a) states in pertinent part that, "No ... local statute or regulation ... or local legal requirement may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." Section 253(c) states that:

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

Section 253(c) does not impose any mandatory obligation on the City of Boston. Rather, as the remarks of Senators Gorton and Feinstein indicate, § 253(c) is intended to recognize the inherent authority of municipalities to manage the use of their rights of way. *See* 141 Rec. S.8170–71 (comments of Senator Feinstein); 141 Cong. Rec. S.8306 (comments of Senator Gorton). Section 253(c) exempts actions by municipalities regarding their rights of way from the administrative process for preemption by the Federal Communications Commission ("FCC") established by § 253(d).[1] 141 Cong. Rec. S.8306 (comments of Senator Gorton).

Section 253(c), however, does not require the City of Boston to do anything. Thus, it appears at this point that it does not create a federal right for which § 1983 provides a remedy.

Even if § 253(c) satisfies all three elements of the *Blessing* test for creating a right, the defendants may be able to prove that Congress has impliedly and specifically foreclosed a remedy under § 1983 by

---

1. Section 253(d) states that:
 If, after notice and an opportunity for public comment, the [FCC] determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) [which relates to certain actions by a State] the [FCC] shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

Thus, § 253(d) generally empowers the FCC to determine, in an administrative proceeding, whether action by a State or municipality is inconsistent with the pertinent provisions of the TCA and, therefore, invalid. The fact that § 253(d) does not refer to § 253(c), however, manifests the intent of Congress that the regulation of rights of way by local governments not be subject to the FCC administrative process for determining questions of possible preemption.

adopting a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983. *See Blessing,* 520 U.S. at 346, 117 S.Ct. 1353. The Supreme Court has indicated that this is a difficult showing to make. *Id.* at 346–47, 117 S.Ct. 1353. Apparently, the Supreme Court has only twice found a remedial scheme to be sufficiently comprehensive to supplant § 1983 when a federal right was at issue. *Id.* at 347, 117 S.Ct. 1353 (citing *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 20, 101 S.Ct. 2615, 69 L.Ed.2d 435(1981), and *Smith v. Robinson,* 468 U.S. 992, 1009, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984)). However, for reasons relating to the following analysis concerning whether an implied private right of action exists, the defendants may, if necessary, be able to make the required showing in this case.

As indicated earlier, it is not now clear whether the plaintiff is likely to succeed in proving that it has an implied private right of action under § 253(c). *See GST Tucson Lightwave, Inc. v. City of Tucson,* 950 F.Supp. 968, 970–71 (D.Ariz.1996) (holding that there is no private right of action under § 253(c)), *appeal dismissed,* 134 F.3d 377 (1998) (table); *but see TCG Detroit v. City of Dearborn,* 977 F.Supp. 836, 839–41 (E.D.Mich.1997) (holding that a private right of action exists under § 253(c)).

▪ In deciding whether a private right of action exists, the issue is whether Congress intended to create a private right of action. *Karahalios v. National Fed'n of Fed. Employees,* 489 U.S. 527, 532, 109 S.Ct. 1282, 103 L.Ed.2d 539 (1989); *Thompson v. Thompson,* 484 U.S. 174, 179, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988); *Sterling Suffolk Racecourse Ltd. Partnership v. Burrillville Racing Ass'n, Inc.,* 989 F.2d 1266, 1268 (1st Cir.1993). A presumption exists against implied private rights of action. *Stowell,* 976 F.2d at 70 n. 5. Thus, the plaintiff must proffer adequate evidence of a contrary intent. *Id.*

In this case, it appears that Congress knew how to clearly create a private right of action when it considered the TCA. It expressly created at least two private rights of action in that statute. *See* 47 U.S.C. §§ 252(e)(6) and 332(c)(7)(B)(v). In addition, Congress expressly provided for private rights of action in various earlier enacted provisions in Title 47. These include 47 U.S.C. §§ 207, 274(e)(2), 406, 407, 532(d), 551(f)(1), 555(a) and 605(e)(1)(3)(A).

The fact that other provisions of the statute expressly provide a private right of action is not, however, the end of the inquiry. *Stepanischen v. Merchants Despatch Transp. Corp.,* 722 F.2d 922, 926–27 (1st Cir.1983). Thus, for present purposes, although their use has at times been criticized by some Justices of the Supreme Court, I have also considered the four *Cort v. Ash* factors. *See* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *but see Thompson,* 484 U.S. at 189, 108 S.Ct. 513 (Scalia, J., concurring and stating that congressional intent is determinative factor); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) ("central inquiry remains whether Congress intended to create ... a private cause of action"); *Cannon v. University of Chicago,* 441 U.S. 677, 731, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (Powell, J., dissenting and stating that "[a]bsent the most compelling evidence of affirmative congressional intent, a federal court should not infer a private cause of action").

The first of the *Cort* factors is whether the plaintiff is a member of the class for whose benefit the statute was enacted. 422 U.S. at 78, 95 S.Ct. 2080. As indicated earlier, municipalities were intended to be the primary beneficiaries of § 253(c). *See* 141 Cong. Rec. S.8170–71; 141 Cong. Rec. S.8306. However, as a potential, new entrant into some parts of the telecommunications business, Cablevision also appears to be a member of the broadest class that the statute was enacted to benefit.

The second and third *Cort* factors are related. They involve indications of legislative intent to create or deny a private

right of action and whether an implied private right of action would be consistent with the underlying purpose of the statutory scheme. *Cort,* 422 U.S. at 78, 95 S.Ct. 2080. The legislative history makes it clear to me at this point that § 253(c) was intended to remove regulation of rights of way issues from the administrative process for preemption by the FCC provided by § 253(d). *See* 141 Cong. Rec. S.8170–71 (1995) (remarks of Senator Feinstein); 141 Cong. Rec. S.8306 (1995) (remarks of Senator Gorton).

Senator Feinstein's original proposed amendment, which was unsuccessful, would have removed all preemption issues from the FCC's power under § 253(d). *See* 141 Cong. Rec. S.8171. Senator Gorton's successful amendment removed only the right of way issues covered by § 253(c) from the FCC's jurisdiction to preempt state and local action in FCC administrative proceedings. *See* 141 Cong. Rec. S.8306. As Cablevision has pointed out, Senator Feinstein did make a remark indicating an understanding that cable companies could sue under the version of § 253 which she was advocating. 141 Cong. Rec. S.8171. That comment, however, related to her original, unsuccessful amendment rather than to the revision which evolved as § 253(c). *Id.*

In addition, the Supreme Court has admonished lower courts not to rely much on isolated floor remarks. For example, in *Bath Iron Works Corp. v. Director, Office of Workers' Compensation Programs,* 506 U.S. 153, 166, 113 S.Ct. 692, 121 L.Ed.2d 619 (1993), the Court stated that, "we give no weight to a single reference by a single Senator during floor debate in the Senate." Similarly, in *Chrysler Corp. v. Brown,* 441 U.S. 281, 311, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), the Supreme Court wrote that, "[t]he remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history."

In view of the foregoing, at this point it is not clear whether Cablevision is reasonably likely to prevail on its claim that private right of action exists under § 253(c).

As I indicated earlier, however, that issue is not material for present purposes. Plaintiff is reasonably likely to be able to show that it has standing to pursue some limited relief based on a claim of preemption under the Supremacy Clause even if Cablevision has neither a private right of action under § 253(c) nor a federal right for which § 1983 provides a remedy. *See New York Airlines,* 623 F.Supp. at 1441–42; *Western Air Lines, Inc. v. Port Auth. of N.Y. and N.J.,* 817 F.2d 222, 225–26 (2d Cir.1987); *AT & T Communications of the Southwest, Inc. v. City of Austin,* 975 F.Supp. 928, 936–937 (W.D.Tex.1997).

 It is important to recognize, however, that a claim under the Supremacy Clause that federal law preempts a state regulation is distinct from a claim for enforcement of that federal law. *Western Air Lines,* 817 F.2d at 225. Thus, federal law may invalidate an inconsistent state or local law, regulation or ordinance if it is shown that federal law is intended to occupy the field. *Golden State Transit,* 493 U.S. at 107, 110 S.Ct. 444. However, the Supremacy Clause cannot be used as a vehicle to require a state or local government to do anything that it is not doing. *Western Air Lines,* 817 F.2d at 226; *White Mountain Apache Tribe v. Williams,* 810 F.2d 844, 847 (9th Cir.1985).

For example, in *New York Airlines,* 623 F.Supp. at 1440, I denied a motion to dismiss when the allegation was that the refusal of an airport commission to allow an airline to use an airport was an attempt to regulate access to the airport. It was contended in that case that the applicable federal law preempted any local regulation regarding routes. *Id.* In *Western Air Lines,* 817 F.2d at 223, the court addressed a rule prohibiting landing of nonstop flights originating 1500 miles or more away from LaGuardia Airport. In *City of Austin,* 975 F.Supp. at 933, the court considered an ordinance requiring municipal

consent to operate a telecommunications service.

In this case, §§ 253(a) and (d) indicate an intent that certain state and local statutes, regulations, and legal requirements be preempted by the TCA. Arguably, the amended grants of location that Boston Edison received from the PIC beginning in September 1998 are a form of regulation. For present purposes, I assume, without deciding, that the Supremacy Clause could operate to invalidate such actions if they rise to the level of a prohibition proscribed by § 253(a). Indeed, Boston Edison argued that the various provisions of § 253 ought to be interpreted in this fashion. Tr. at 81–7. The current complaint does not allege that conduct covered by § 253(c) violated § 253(a), but if this were only an issue of pleading, an amendment to the complaint could be permitted. It may be, however, that § 253(c) expresses an intent that 253(a) not operate to preempt local regulation of municipalities' rights of way under any circumstances. This is a question that will require more analysis to decide, perhaps in the context of a future motion to dismiss.

Thus, there is an open issue regarding whether any conduct involved in this case is subject to preemption. As described earlier, if there is, the court could invalidate certain prior actions, exercising the power provided by the Supremacy Clause. *Western Air Lines,* 817 F.2d at 226; *White Mountain Apache Tribe,* 810 F.2d at 847. The court could not, however, properly issue an injunction preventing the Boston Edison defendants from expanding for a year their network of fiber-optic cable or cable television customer base in the absence of a § 1983 claim that is viable or an implied private right of action. *Id.*[2]

Even if Cablevision has a right of action of some sort, the plaintiff is not reasonably likely to prevail on its claim that the defendants have violated 47 U.S.C. § 253.

The plaintiff asserts that § 253(c) requires that the City regulate the use of conduit and cables under streets in a manner which is "competitively neutral" and "nondiscriminatory." *See, e.g.,* Compl. at 1; Pl.'s Mem. in Supp. of Mot. for T.R.O. at 1. Once again, § 253(c) states that:

> Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

The syntax of this provision renders its meaning ambiguous. It is not clear whether the phrase "competitively neutral and nondiscriminatory" applies only to the compensation that can be required, as defendants allege, or whether it also applies to the management of public ways, as Cablevision asserts. As defendants argue, if the term "competitively neutral" was intended to apply to the management of public ways as well as compensation, that term could have been placed before the references to management of public ways and compensation in § 253(c), as was done in § 253(b).[3]

---

**2.** I have also considered the defendants' contention that the court should not address the merits of this case, but rather defer to the purported primary jurisdiction of the Massachusetts Department of Telecommunications and Energy. At this time, however, the DTE does not have a Rule covering possible violations of § 253 of the TCA. Tr. at 131–33, 137. Nor is there any DTE proceeding to which the City of Boston is a party. *See id.* 133–135; *Cablevision of Boston v. Boston Edison Co.,* DPU/DTE 97–82, Order on Scope of the Proceedings at 7 (Feb. 11, 1998). Thus, I find that the standards for abstention in deference to the alleged primary jurisdiction of the DTE are not met. *See Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982).

**3.** Section 253(b) states:

> Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section

The legislative history of § 253 indicates that the term "competitively neutral," at least, applies only to the compensation a telecommunications provider may be charged. More specifically, the Conference Report on the TCA states, in pertinent part:

Subsection (c) of new section [253] provides that nothing in new section [253] affects the authority of States or local governments to manage the public rights-of-way *or* to require on a competitively neutral and nondiscriminatory basis, fair and reasonable compensation for the use of public rights-of-way on a nondiscriminatory basis, provided any compensation required is publicly disclosed.

142 Cong. Rec. H1111 (daily ed. Jan. 31, 1996) (H.R.Conf.Rep.104–458) (Emphasis added).

Moreover, at least one court has interpreted § 253(c)'s requirement of competitive neutrality as applying only to the question of compensation. In *AT & T Communications of the Southwest, Inc. v. City of Dallas*, 8 F.Supp.2d 582, 587 (N.D.Tex.1998), the court wrote, " § 253(c) allows states or local governments to 'manage the public rights-of-way' *and* 'require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way,'" (emphasis added).

In view of the foregoing, I find that the plaintiff is not likely to prove that the term "competitively neutral" in § 253(c) applies to the management of public rights of way. A requirement of nondiscrimination, which appears two times in § 253(c), may apply to the management of public rights of way. After hearing from Casazza, particularly, it appears to me that Congress would have had a logical basis for making this distinction.

More specifically, it appears that traditionally those responsible for the management of public rights of way are likely, perhaps, to be engineers, but not experts on the effects that their actions may have on competition. Such individuals can easily understand and apply a standard that requires that similarly-situated users of the streets pay equally for that privilege. It would, however, be a radical revision of their historic responsibilities to require them to make decisions that are competitively neutral. As explained earlier, § 253(c) was, in part, intended to make clear that § 253(a) was not intended to alter the traditional power of municipalities to control their streets. The plaintiff's proposed interpretation of 253(c) would be inconsistent with this purpose, among other things.

 Assuming, without finding, however, that § 253(c) requires that the City not discriminate in the management of its public rights of way, the plaintiff is not likely to prevail in proving that the City did discriminate with regard to the Boston Edison defendants. Black's Law Dictionary defines "discrimination" as "a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored." *Blacks Law Dictionary* 420 (5th ed.1979). It is not, however, discrimination to make distinctions based on valid considerations. The legislative history cited and quoted by the court in *TCG Detroit v. City of Dearborn*, 16 F.Supp.2d 785, 792–93 (E.D.Mich. 1998), indicates that those who drafted § 253 understood this principle.

In this case, the City of Boston has treated Boston Edison and its affiliates in the same way that it has treated other, similarly-situated entities. The City has had valid reasons for what Cablevision improperly characterizes as improper disparate treatment of the Boston Edison defendants.

254 [47 U.S.C. § 254], requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of customers.

Cablevision alleges that, because the PIC's Policy for New Conduit requires builders of new conduit to disclose their plans publicly, allow other providers to participate, and construct shadow conduit for future use, it is discriminatory for the City to have allowed Boston Edison to convert its existing conduit and cable to new uses without doing the same. There is, however, an obvious, principled difference between the construction of new conduit and the conversion of existing conduit.

Constructing new conduit requires digging up the City's streets and attendant disruption. Putting new cable in existing conduit or converting existing cable to new uses does not require digging up streets or disruption. Thus, it is not discrimination for the City to have different policies for the construction of conduit that is new and for the conversion of the uses to which existing conduit can be put.

The Boston Edison defendants have built some new conduit. Affidavit of James Hanley ¶ 9–10. The record indicates that they have been required to follow the City's policy for the construction of new conduit and have done so. *Id.*

To the extent that the Boston Edison defendants converted pre-existing conduit without prior PIC approval and later received amended grants of location when the PIC decided to claim that they were necessary, the Boston Edison defendants have been treated in the same manner as the one identified similarly-situated entity, Bell Atlantic. Tr. at 199–202, 218.

It appears, however, that Cablevision has engaged in some similar conversion of its conduit, and now plans much more, without prior or subsequent action by the PIC. *See* Hahn Aff. ¶¶ 40–42. Cablevision claims that it does not need any action by the PIC to add new cable to its conduit for expanded telecommunications uses because it is already authorized to engage in the broad-band telecommunications business. Tr. at 17–18, 243. This may be disputed. *Id.* at 18. It appears, however, that at this time Cablevision has an advantage over the Boston Edison defendants with regard to the process for converting existing conduit to new uses.

Cablevision also claims that it is neither "competitively neutral" nor "nondiscriminatory" for PIC to allow Boston Edison to convert its existing conduit without incurring the expense involved in building shadow conduit that is imposed on those who must build new conduit for themselves. Plaintiff claims that this gives Boston Edison an unfair competitive advantage. However, allowing a utility to use its existing conduit for telecommunications services without imposing a special fee is not a form of discrimination that the TCA seeks to prohibit. To the contrary, the use of existing conduit, by utilities, to provide new telecommunications services is precisely what the TCA intends to promote as a means of enhancing competition and its benefits for the public. *See e.g., Competition Among Video Delivery Systems: Hearing of the Telecommunications, Trade and Consumer Protection Subcommittee of the Committee*, Federal News Service (July 29, 1997).

Thus, for the foregoing reasons, I find that Cablevision is not likely to prevail on its claim that the defendants have violated 47 U.S.C. § 253.

### 2. *Cablevision is Not Likely to Prevail on Its State Law Claim*

Cablevision also does not have a reasonable likelihood of prevailing on its M.G.L. c. 93A claim.

Chapter 93A prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." M.G.L. c. 93A, § 2(a). A practice is unfair or deceptive where it (1) is within the penumbra of some common law, statutory, or other established concept of fairness; (2) is immoral, unethical, oppressive or unscrupulous; or (3) causes substantial injury to competitors. *See PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596, 321

N.E.2d 915 (1975). Because litigation under chapter 93A is "rampant," the courts have developed a rather rigorous test for assessing such claims. *Johnson v. Koplovsky Foods, Inc.*, 5 F.Supp.2d 48, 55 (D.Mass.1998). "The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1513 (1st Cir.1989) (quoting *Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 504, 396 N.E.2d 149 (1979)).

In addition, M.G.L. c. 93A, § 3, provides that:

> Nothing in [chapter 93A] shall apply to transactions or actions otherwise permitted under the laws as administered by any regulatory board or officer acting under the statutory authority of the commonwealth or of the United States.

As explained below, the defendants are likely to be able to prove that by virtue of the PIC actions taken since September 1998, they are exempt from liability under § 3. Even if § 3 is not applicable, however, the plaintiff is not likely to succeed in proving a violation of c. 93A.

▆ The heart of the plaintiff's c. 93A claim is that Boston Edison secretly and illegally became a "stealth telecommunications provider" by converting its existing conduit to provide telecommunications services in violation of a purported City policy and City ordinances. Pl.'s Mem. in Supp. of Mot. for T.R.O. at 27–29. Nowhere in its two lengthy briefs did Cablevision mention M.G.L. c. 166, § 22 in the context of discussing its chapter 93A claim, although it did, as the matter evolved, substantially base its c. 93A argument on this statute at the January 20, 1999 hearing. *Compare* Pl.'s Mem. in Supp. of Mtn. for T.R.O. at 11, 26–30 *and* Pl.'s Reply Mem. at 11, 13, 61–65 *with* Tr. at 150–153, 230–232, 234–236.

Essentially for the reasons described earlier, the plaintiff is not likely to prove that Boston Edison illegally became a "stealth telecommunications provider." Once again, at this point the evidence indicates that the Boston Edison defendants made no misrepresentations to the PIC. The Boston Edison defendants did not violate any agreement with the PIC. The Boston Edison defendants did not violate any policy adopted by the PIC concerning the conversion of existing conduit or cable to telecommunications uses.

Indeed, since September 1998, the PIC has granted the Boston Edison defendants a series of amended grants of location concerning the prior rewiring of its conduit to provide telecommunication services. Thus, it appears that the defendants are likely to be able to prove that the exemption provided by c. 93A, § 3 is applicable in the instant case.

▆ The burden is on the defendants to show that § 3 applies to the conduct in question. *Bierig v. Everett Square Plaza Assocs.*, 34 Mass.App.Ct. 354, 367 n. 14, 611 N.E.2d 720 (1993); *see also Commonwealth v. DeCotis*, 366 Mass. 234, 240, 316 N.E.2d 748 (1974); *Rini v. United Van Lines*, 903 F.Supp. 224, 231 (D.Mass.1995), *rev'd on other grounds*, 104 F.3d 502 (1st Cir.1997). Moreover, " 'a defendant must show more than the mere existence of a related or even overlapping regulatory scheme that covers the transaction. Rather, a defendant must show that such scheme affirmatively permits the practice which is alleged to be unfair or deceptive.' " *Bierig*, 34 Mass.App.Ct. at 367 n. 14, 611 N.E.2d 720 (citation omitted). *See also Rini*, 903 F.Supp. at 231 (quoting same). At this point, it appears that the defendants are likely to be able to make this showing.

▆ It also appears that Cablevision will be unlikely to prevail on its belated argument that M.G.L. c. 166, § 22, provides a basis for a valid c. 93A claim. Section 22 was enacted originally in 1849 and was most recently amended in 1925. It was plainly not written with the TCA

and the conversion of utility conduit to other purposes in mind.

However, there are several paragraphs in § 22. The first paragraph of § 22 relates to the *construction* of new facilities, including conduit. *See* M.G.L. c. 166, § 22. A company must obtain permission from the relevant municipality for such construction. *Id.* It must file a petition giving notice of its desire to construct. *Id.* The municipality must conduct a public hearing before authorizing the proposed construction by issuing what are referred to as "grants of location." *Id.*

The second paragraph of § 22 addresses requests to *increase* the number of cables in a conduit after it is constructed. *Id.* It provides that a municipality may authorize such an increase without notice or a hearing. *Id.* In addition, the Massachusetts Supreme Judicial Court has held that under § 22 no notice or hearing is necessary for a municipality to grant authority to another company to employ existing utility poles for new uses, specifically including cable television. *Gillis v. Mass. Cablevision, Inc.*, 369 Mass. 526, 528, 533–34, 340 N.E.2d 872 (1976). This conclusion is equally applicable to the Boston Edison conduit converted to new uses for the Joint Venture that is involved in this case.

Thus, at present, it appears that the actions of the City with regard to the Boston Edison defendants did not violate § 22. Indeed, by holding a public hearing, the PIC may have done more than the law requires. It has done more than § 22 requires.

In any event, as the Supreme Judicial Court said in *Boston Edison Co. v. Town of Sudbury*, 356 Mass. 406, 423, 253 N.E.2d 850 (1969), § 22 contains, "somewhat vague language." Section 22 does not appear to be a consumer protection statute. In these circumstances, even if § 22 was violated—and it appears to me that it was not—the violation in this case would not also constitute a violation of c. 93A.

In view of the foregoing, I find that the plaintiff has failed to establish a reasonable likelihood of success on the merits, the *sine qua non* for obtaining a preliminary injunction.

### 3. This Case Involves the Potential for Irreparable Harm to Cablevision

With regard to irreparable harm, for present purposes I assume that Cablevision will lose market share because the Boston Edison defendants have what the plaintiff calls a "head-start" in providing bundled telecommunications services to residents of Boston. I also assume that such a loss would be irreparable harm because the competitive injury involved would be difficult to quantify. *See Cohen v. Brown Univ.*, 991 F.2d 888, 904–05 (1st Cir.1993); *see also Ross–Simons*, 102 F.3d at 19.

However, to a certain extent, any such harm to Cablevision is a self-inflicted wound. Boston Edison has spent two years preparing to do what the TCA encourages—compete to provide bundled telecommunications services in Boston. Cablevision has only recently begun to do so. Boston Edison would not have a "head start" if Cablevision had responded in Massachusetts more promptly to the invitation of the TCA, as it apparently has done in other states.

### 4. The Balance of Hardship Favors the Defendants

I have also considered the balance of hardship. A preliminary injunction preventing expansion of the Joint Venture's network and the growth of its business would harm the defendants more than the absence of a preliminary injunction will harm Cablevision. A preliminary injunction would stigmatize the Joint Venture. It would cost the Joint Venture market share which, as I said, I assume is a form of irreparable harm. It might also keep the Joint Venture's fledgling business, which now has only three percent of the Boston cable television market, from ever regaining momentum.

In the absence of a preliminary injunction, Cablevision can continue to plan to compete in providing telecommunications services in addition to cable television. Indeed, it can have access to Boston Edison's conduit on the same basis as the Joint Venture has it if it wants to use that conduit. *See* Stipulation and Order ¶ 4 (Dec. 23, 1998). In these circumstances, the issuance of a preliminary injunction would harm defendants more than its absence will injure Cablevision.

5. *The Public Interest Will Be Served By Denying the Preliminary Injunction*

■ I have also considered the implications for the public interest of the requested preliminary injunction. I find that in the circumstances of this case, the public interest will be served by denying the preliminary injunction.

As indicated earlier, the TCA was enacted to promote competition in the cable television business, among others. *See, e.g., Annual Assessment of the Status of Competition in Markets for the Delivery of Video Programming,* FCC 98–335 (Dec. 23, 1998) (the "FCC Report"), Statement of Chairman William Kennard (appended to Report). Those who enacted the TCA recognized that utilities were important potential competitors. *See* Federal News Service, *supra.* It expected that consumers would benefit from competition. *See* FCC Report, *supra.* The evidence at this point does not indicate that the private defendants have been preparing to compete unfairly with Cablevision. They are just now actively entering the Boston cable television market.

Generally, it appears that the competition and related benefits anticipated by the TCA have not yet been realized in most communities, including Boston. The Federal Communications Commission has lamented this. As its Chairman recently wrote: "Congress envisioned that the removal of market entry barriers would produce robust competition offering a wide array of viewing choices at reasonable prices to millions of American families across the nation." FCC Report, Statement of Chairman William Kennard (appended to Report). However, "[l]ocal markets for the delivery of video programming...continue to be highly concentrated and characterized by substantial barriers to entry by potential [multi-channel video programming distributors]." *Id.* at 80, ¶ 126. Evidently as a result, between June 1997 and June 1998, "cable rates rose more than four times the rate of inflation." *Id.* at 5, ¶ 9.

Cablevision has brought this suit, which I have preliminarily found has little chance of succeeding, just as the people of Boston have a realistic hope of receiving the benefits of fair competition in the cable television industry. Those benefits include more choices, better service and the prospect of lower prices. It would be contrary to the public interest to issue the preliminary injunction Cablevision now seeks.

*ORDER*

Thus, for all of the foregoing reasons, Cablevision's motion for preliminary injunction is hereby DENIED.